Martha Jo CATHEY, Plaintiff-Appellant (82–5393), Plaintiff-Appellee (82–5425),

Mary Cavett, Administratrix, Plaintiff-Appellee (82–5580),

v.

JOHNS-MANVILLE SALES CORPORA-TION; Raymark Industries; the Celo-tex Corporation; Pittsburgh-Corning Corporation; Owens-Corning Fiber-glass Corporation; Fibreboard Corpo-ration; GAF Corporation; Nicolet, Inc.; Southern Asbestos Company and Ow-ens-Illinois, Incorporated, Defendants-Appellees (82–5393),

Johns-Manville Sales Corporation, De-fendant-Appellant (82–5425, 82–5580)

Nos. 82–5393, 82–5425 and 82–5580.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 19, 1985.

Decided Nov. 13, 1985.

H. Douglas Nichol (argued), Paul Gillenwater, Gillenwater, Whelchel & Nichol, Knoxville, Tenn., for appellant.

Fred H. Cagle, Jr., W. Kyle Carpenter (argued), Knoxville, Tenn., M. Anderson Cobb, Jr., Harris, Shelton, Dunlap & Cobb, Memphis, Tenn., H. Keith Jarvis (argued), Montgomery, Green & Jarvis, Englewood, Colo., for Johns-Manville.

Donald F. Paine, Dwight E. Tarwater (argued), T. Harold Pinkley, Egerton, McAfee, Armistead & Davis, Knoxville, Tenn., for Raymark Industries, Inc.

George B. McGugin; William Southerland (argued), Watkins, McGugin, McNeilly & Rowen, Nashville, Tenn., for Celotex Corp.

Charles C. Trabue, III, Gayle E. Malone, Jr., Gary M. Brown (argued), Trabue, Stur-

divant & DeWitt, Nashville, Tenn., for Pittsburgh-Corning Corp.

Darrell G. Townsend, Howell, Fisher, Branham & North, Nashville, Tenn., for Owens Corning Fiberglass Corp.

Hugh J. Moore, Jr. (argued), Witt, Gaither & Whitaker, Chattanooga, Tenn., for GAF Corp.

Graham Bartlett, Knoxville, Tenn., for Nicolet, Inc.

William A. Young (argued), Taylor & Grover, Knoxville, Tenn., for Fibreboard Corp.

Louis C. Woolf (argued), Robert G. McDowell, J. Randolph Bibb, Jr., Baker, Worthington, Crossley, Stansberry & Woolf, Nashville, Tenn., for Owens-Illinois, Inc.

Before KEITH and JONES, Circuit Judges, and NEWBLATT *, District Judge.

KEITH, Circuit Judge:

These two cases involve actions for personal injuries brought against various manufacturers of asbestos containing insulation products. Although the two cases have been consolidated on appeal, given the number and complexity of the issues raised by each case, we will analyze each case separately.

## I.

### CAVETT v. JOHNS–MANVILLE SALES CORPORATION

This appeal arises out of an action brought by plaintiff, James O. Cavett, against Johns-Manville Sales Corporation and numerous other manufacturers of asbestos-containing insulation products. By the time of the trial, however, Johns-Manville was the only remaining defendant. The case was tried in the United States District Court for the Eastern District of Tennessee before the Honorable David S. Porter, sitting by designation. The jury returned a verdict in favor of the plaintiff

* Honorable Stewart A. Newblatt, United States District Court for the Eastern District of Michi- gan, sitting by designation.

for $800,000 compensatory and $1,500,000 punitive damages.

After entry of the judgment, Johns-Manville filed a motion for judgment notwithstanding the verdict, or in the alternative for a new trial. Johns-Manville also filed a motion to amend the judgment so as to allow a credit for the amount paid in settlement by other defendants. In an order entered August 20, 1982, the district court addressed the various post-judgment motions. The district court expressly denied the motion for judgment notwithstanding the verdict and instructed the clerk to enter judgment in favor of Cavett for the amount of the verdict. The court, however, granted Johns-Manville's motion allowing a credit for the amount paid by other defendants in settlement.

Johns-Manville filed a timely appeal from the district court's judgment. Although Johns-Manville had filed for Chapter 11 reorganization under the Bankruptcy code, the bankruptcy court has entered an order allowing this appeal to proceed. Also, while this appeal was pending, plaintiff, James O. Cavett, died and his administratrix, Mary Cavett, has been substituted as plaintiff-appellee.

In approximately 1939, Mr. Cavett began working as a boilermaker. For over forty years Mr. Cavett worked as a boilermaker, building and repairing boilers in various stone plants. As a boilermaker, Mr. Cavett worked in close proximity to insulation workers, who applied various types of insulation products to the boilers and pipes.

At the trial, Mr. Cavett described the dust conditions caused by the insulation materials as so bad that it looked as if "someone dumped a barrel of flour on you". Mr. Cavett also testified that he recalled seeing Johns-Manville insulation products on every job he worked and that Johns-Manville provided approximately 80 to 90 percent of the insulation materials for all the jobs on which he worked. Mr. Cavett's testimony was supported by two insulation workers who testified that they had worked with Mr. Cavett on particular jobs, that the insulation materials they applied were products of Johns-Manville and

that the dust conditions created by the insulation products were such that dust could be seen on the boilermaker's workclothes.

Dr. William K. Swann, Mr. Cavett's treating physician, also testified at the trial. Dr. Swann testified that he had been treating Mr. Cavett since May 1980, when Mr. Cavett was initially seen for chest problems resulting from a collapsed lung. In January 1981, Dr. Swann diagnosed Mr. Cavett as suffering from lung cancer. Subsequently, Dr. Swann also diagnosed Mr. Cavett as suffering from asbestosis and in approximately November 1981, rendered the opinion that Mr. Cavett's lung cancer was caused by his asbestos exposure.

As a result of Mr. Cavett's lung cancer, surgery was performed removing the upper portion of his right lung. Mr. Cavett was again hospitalized in September 1981, at which time it was discovered that he had experienced a recurrence of lung cancer. This recurrence was treated by cobalt radiation. Mr. Cavett was again hospitalized in March 1982 for further cobalt therapy and during that hospitalization it was discovered that the cancer had spread to his bones. In April 1982, Mr. Cavett was hospitalized and started on chemotherapy. He was again hospitalized from May 30, until June 5, 1982, for supportive therapy in an effort to get him to eat, since he had lost 65 pounds from the time of his initial surgery.

At the time of trial Mr. Cavett was once again hospitalized because of his inability to eat, his weight loss, and his extreme weakness. All of these problems were a result of his lung cancer, and he was placed on pain medication consisting of morphine and percodan. Dr. Swann expressed the opinion at trial that Mr. Cavett was suffering from terminal cancer, which was spread beyond its original site to distant places and that his outlook was very poor.

Dr. Lynn Blake, Chief of Pathology and Director of Laboratories at the East Tennessee Baptist Hospital, testified that he had reviewed Mr. Cavett's lung tissue slides. Based upon this review, Dr. Blake rendered the opinion that Mr. Cavett was

suffering from asbestosis and lung cancer, and that the lung cancer was caused by Mr. Cavett's asbestos exposure and asbestosis.

Dr. Bertram Carnow, a professor of occupational and environmental medicine at the University of Illinois Medical Center in Chicago, Illinois, testified as to his review of medical records and x-rays of Mr. Cavett. Based upon this review, Dr. Carnow was also of the opinion that Mr. Cavett had asbestosis, and that Mr. Cavett's cancer was, to the largest degree, caused by asbestos.

On appeal Johns-Manville raises six issues:

WHETHER TENNESSEE LAW PERMITS AN AWARD OF PUNITIVE DAMAGES IN THIS PRODUCTS LIABILITY ACTION;

WHETHER JOHNS–MANVILLE'S CONSTITUTIONAL RIGHT TO DUE PROCESS IS VIOLATED BY MULTIPLE AWARDS OF PUNITIVE DAMAGES FOR THE SAME COURSE OF CONDUCT;

WHETHER THE DAMAGE AWARDS ARE SO EXCESSIVE THAT JOHNS–MANVILLE SHOULD BE GRANTED A REMITTITUR OR NEW TRIAL;

WHETHER THIS CASE SHOULD BE REMANDED TO THE TRIAL COURT FOR A RULING ON THE DEFENDANT'S MOTION FOR NEW TRIAL;

WHETHER A NEW TRIAL SHOULD BE GRANTED BECAUSE OF ERRORS IN EVIDENTIARY RULINGS IN THE TRIAL BELOW;

WHETHER JOHNS–MANVILLE HAS A VESTED RIGHT IN THE STATUTE OF REPOSE CONTAINED IN THE TENNESSEE PRODUCTS LIABILITY ACT WHICH COULD NOT BE ABROGATED BY RETROACTIVE APPLICATION OF THE AMENDMENT REMOVING ASBESTOS CASES FROM THE PURVIEW OF THE STATUTE OF REPOSE.

We will treat each issue.

*Punitive Damages*

The principal issue in both this case and its companion, *Cathey v. Johns-Manville Sales Corporation,* Nos. 82–5393, 82–5425, is whether, under Tennessee law, punitive damages can be awarded in an asbestos products liability case. Since the Tennessee Supreme Court has not ruled upon this issue, under the Erie Doctrine this Court is obligated to exercise its best judgment as to how the Tennessee High Court would rule if confronted with this issue. *Bagwell v. Canal Insurance Company,* 663 F.2d 710 (6th Cir.1981).

Although the trial judge below allowed the issue of punitive damages to go to the jury and upheld the jury's subsequent punitive award, the trial judge expressed doubt as to the propriety of such an award in an asbestos products liability case. *See* Joint Appendix at A–50. As we understand it, the trial judge was concerned about the possibility of the "overkill" of the defendant through the potential award of punitive damages in each of the numerous suits currently pending against Johns-Manville. Also, the trial judge was concerned that the repeated award of large sums for punitive damages to the current generation of litigants would quickly exhaust the resources of the defendant and the insurers, thereby depriving future litigants of a source for compensatory recoveries. *Bunch v. Johns-Manville Sales Corporation,* No. 3–81–416 (E.D.Tenn. Jan. 16, 1982) (Posttrial order) (reproduced in Appellant's Brief at A17–20).

Notwithstanding these serious public policy concerns, we do not believe that they present a proper basis upon which this Court can rest a diversity decision. First, with respect to the so-called "overkill doctrine", in *Moran v. Johns-Manville Sales Corp.,* 691 F.2d 811 (6th Cir.1982), this Court directly addressed this concern:

[Johns-Manville] urges with particular force that punitive damages should not be awarded against a company that faces a multitude of product liability actions. If punitive damages are awarded in many of these actions, JM argues that it will not be punished, but destroyed. We have read Judge Friendly's interesting essay on such a prospect, and its implica-

tions for the law, in *Roginsky v. Richardson-Merrell, Inc.*, 378 F.2d 832, 838–41 (2d Cir.1967). However eloquent the essay, it is confessed dictum. Judge Friendly noted that "the New York cases afford no basis for our predicting that the [New York] Court of Appeals would adopt a rule disallowing punitive damages in a case such as this, and the *Erie* doctrine wisely prevents our engaging in such extensive law-making on local tort liability, a subject which the people of New York have entrusted to their legislature and, within limits, to their own courts, not to us." *Id.* at 841. So it is here. The relief sought by JM may be more properly granted by the state or federal legislature than by this Court. 691 F.2d at 817. Accordingly, we adhere to reasoning of the court in *Moran* and reject the so-called "overkill doctrine" as a basis for denying an otherwise proper punitive damages recovery.

Next, with respect to the concern pertaining to the exhaustion of a finite amount of resources, we similarly believe that such a public policy argument is not a proper basis upon which this Court can rest its decision. As an institution, this Court is empowered to exercise judicial authority over certain matters where both subject matter and personal jurisdiction exist. Thus, we reject the exhaustion of a finite resource argument as a basis for denying an otherwise proper punitive damages recovery.

In *Johnson v. Husky Industries, Inc.*, 536 F.2d 645 (6th Cir.1976), this Court summarized the law in Tennessee on punitive damages.

> Under Tennessee law punitive damages may only be awarded in cases involving fraud, malice, gross negligence or oppression, where a wrongful act is done with a bad motive or so recklessly as to imply a disregard for social obligations, or where there is such willful misconduct or entire want of care as to raise a presumption of conscious indifference to consequences. *Inland Container Corp. v. March*, 529 S.W.2d 43, 45 (Tenn.1975). Such damages are allowed as punishment of the wrongdoer and are not based

> so much upon the nature and extent of the injury as they are upon the oppression of the party who does the injury. *Lazenby v. Universal Underwriters Insurance Co.*, 214 Tenn. 639, 642, 383 S.W.2d 1, 4 (1964).

536 F.2d at 650.

■ Given this Tennessee standard for the awarding of punitive damages, this Court sees no logical reason why a product liability litigant who presents sufficient evidence to meet this standard should be precluded from recovering punitive damages. *See Cathey v. Johns-Manville, infra* at 1579–81. Thus, we hold that under Tennessee law an asbestos product liability claimant, such as Mr. Cavett, can recover punitive damages if he meets the Tennessee standard for the awarding of punitive damages.

■ Having decided in the abstract that under Tennessee law a product liability claimant who presents sufficient evidence to satisfy the Tennessee standard for receiving punitive damages will not be foreclosed from such a recovery simply because his cause of action is founded upon a theory of products liability, it remains for us now to determine whether Mr. Cavett presented sufficient evidence to satisfy this standard. In *Moran v. Johns-Manville Sales Corp.*, this Court was presented with the issue of the allowability of punitive damages in a diversity products liability case governed by Ohio law. In finding punitive damages appropriate in *Moran*, this Court held: "A jury question of punitive damages was established if a reasonable juror could have concluded that [Johns-Manville's] failure to place warning labels on insulation products before 1964 manifested such a 'flagrant indifference' to users' risk of harm." 691 F.2d at 815.

At trial, and in their pleadings before this Court, both sides have presented extensive evidence concerning the state of medical and scientific knowledge about the health hazard presented by asbestos-containing products. A reasonable jury could rationally have relied upon the plaintiff's evidence, principally the deposition testimo-

ny of a former Johns-Manville Medical Director, the late Dr. Kenneth Smith, to believe that in the late 1940's Johns-Manville was aware that it was "producing disease in employees who manufactured the [asbestos-containing] products" and that "disease [was] being produced in non-JM employees who may use certain of these products." Joint Appendix at A–203. Further, a jury could rationally have believed the testimony of Dr. Smith that he recommended the use of warning or cautionary labels on asbestos-containing products in 1951 or 1952. Joint Appendix at 201. Based upon evidence such as Dr. Smith's deposition the jury could rationally have believed that the failure of Johns-Manville to promptly warn the users of its asbestos-containing insulation products of possible health hazards was the type of wrongful act done so recklessly as to imply a disregard for social obligations or was a demonstration of an entire want of care sufficient to raise a presumption of conscious indifference to the consequences. *See Johnson v. Husky Industries, Inc.*, 536 F.2d at 650; *see also Moran v. Johns-Manville Sales Corp.*, 691 F.2d at 815.

Accordingly, we hold that the trial court was correct in entering judgment upon the jury's award of punitive damages to Mr. Cavett.

*Violation of Due Process*

■ Next we address Johns-Manville's argument that by subjecting it to multiple civil punishment for the same course of conduct its constitutional guarantee of due process is violated. This argument is derived from the language of a decision by the United States District Court for the Northern District of California in a relatively recent mass tort case. *In re: Northern District of California "Dalkon Shield" IUD Products Liability Litigation*, 526 F.Supp. 887 (N.D.Cal.1981), *rev'd on other grounds*, 693 F.2d 847 (9th Cir. 1982), *cert. denied*, 459 U.S. 1171, 103 S.Ct. 817, 74 L.Ed.2d 1015 (1983). In the *"Dalkon Shield"* case the California district court stated:

A defendant has a due process right to be protected against unlimited multiple punishment for the same act. A defend-

ant in a civil action has a right to be protected against double recoveries not because they violate "double jeopardy" but simply because overlapping damage awards violate that sense of "fundamental fairness" which lies at the heart of constitutional due process....

Our law on punitive damages was created in an era of single plaintiff versus single defendant disputes and has not yet been adapted to the complexity of multi-party litigation. Common sense dictates that a defendant should not be subjected to multiple civil punishment for a single act or unified course of conduct which causes injury to multiple plaintiffs.

526 F.Supp. at 899–900.

While this fundamental fairness public policy argument is not without some appeal, we reject it as a basis for foreclosing the awarding of punitive damages in this Tennessee diversity case. As a matter of federal constitutional law we believe that the presence of a judicial tribunal before which to litigate the propriety of a punitive damages award provides Johns-Manville with all of the procedural safeguards to which it is due. As a matter of state public policy we do not believe that the Tennessee Supreme Court would proscribe the availability of punitive damages merely because the defendant's alleged tortious behavior resulted in harm to a large number of people. *Cf. Froud v. Celotex Corp.*, 107 Ill.App.3d 654, 63 Ill.Dec. 261, 264, 437 N.E.2d 910, 913 (1982) ("We do not believe that defendants should be relieved of liability because, through outrageous misconduct, they have managed to seriously injure a large number of persons. Such a rule would encourage wrongdoers to continue their misconduct because, if they kept it up long enough to injure a large number of people, they could escape *all* liability for punitive damages."), *rev'd on other grounds*, 98 Ill.2d 324, 74 Ill.Dec. 629, 456 N.E.2d 131 (1983).

Accordingly, we hold that the defendant was not deprived of due process by the awarding of punitive damages in this case.

*Remittitur*

■ Next we address Johns-Manville's argument that the jury's award of both compensatory and punitive damages was excessive and that the trial court should have ordered a remittitur of the awards. In *Manning v. Altec, Inc.*, 488 F.2d 127 (6th Cir.1973), this Court quoted approvingly the observation of the District of Columbia Circuit concerning remittiturs. In part, this Court noted:

> Where the jury finds a particular quantum of damages and the trial court refuses to disturb its findings on the motion for a new trial, the two factors press in the same direction, and an appellate court should be certain indeed that the award is contrary to all reason before it orders a remittitur or a new trial.

488 F.2d at 133 (quoting *Taylor v. Washington Terminal Company*, 409 F.2d 145, 148 (D.C.Cir.); *cert. denied*, 396 U.S. 835, 90 S.Ct. 93, 24 L.Ed.2d 85 (1969)). Applying this standard to the evidence presented at trial, we cannot say that we are "certain indeed that the award [was] contrary to all reason."

At trial it was established that Mr. Cavett was 68 years old at the time of trial, with a life expectancy of 11.39 years. Joint Appendix at A–124, A–226. It was also established that prior to being stricken by lung cancer, Cavett was gainfully employed and earning in excess of $24,000 a year. Mr. Cavett testified that had he not gotten ill, he intended to continue working until age 70 and perhaps longer. Joint Appendix at A–141. Also, there was evidence that as of the time of trial Mr. Cavett had incurred medical expenses of approximately $26,000. Joint Appendix at A–225.

The parties are in agreement that, if he prevailed, Mr. Cavett was entitled to receive compensation for his medical expenses, loss of earning capacity, pain and suffering and loss of enjoyment of life. Johns-Manville contends, however, that these items cannot reasonably support an $800,000 compensatory award. We do not agree. While we recognized that $800,000 is a sizeable compensatory award on the record before us, we are not prepared to disregard the determination of both the jury and the trial judge and reduce this award.

■ With respect to the punitive damages award, it is the rule in Tennessee that "[t]he amount to be awarded as punishment in a civil action, of course, must depend upon all of the circumstances." *Loope v. Goodings Million Dollar Midways, Inc.*, 553 S.W.2d 573, 575 (Tenn. 1977). In fully laying out the circumstances of this case, Johns-Manville argues, with some force, that this Court should be mindful that it is currently involved in a large number of other suits and that punitive awards of the magnitude at bar will surely annihilate the company.

While this Court is aware that a $1,500,000 punitive damage award will increase the difficulty that Johns-Manville faces in attempting a Chapter 11 reorganization, this Court is also aware that there is evidence in the record which suggests that Johns-Manville knew of the tremendous health hazards certain of its products represented and for some twelve or thirteen years refused to even warn the users of these products of the health hazards. When the particular facts and circumstances of this case are reviewed in this light, we are not prepared to disregard the determination of the jury and trial judge. Accordingly, we affirm the decision of the district court in denying the defendant's motion for a remittitur.

*Failure to Rule on Motion for A New Trial*

■ Next, we address Johns-Manville's argument that the district court failed to rule on its motion for a new trial. Johns-Manville contends that the trial court, in ruling on defendant's posttrial motion for judgment notwithstanding the verdict, or in the alternative, for a new trial or remittitur, "apparently failed to consider defendant's grounds for new trial." Appellant's Brief at 30.

It is clear that:

A motion for new trial is addressed to the sound discretion of the Court, and

should be granted if it will do substantial justice. The trial judge has a responsibility to weigh the evidence and to set aside the jury's verdict when, in his conscientious opinion, the verdict is contrary to the weight of the evidence. *Cecil Corely Motor Company, Inc. v. General Motors Corporation,* 380 F.Supp. 819, 859 (M.D.Tenn.1974). Johns-Manville was also entitled to have the court pass upon its motion for a new trial in the exercise of its own independent judgment. *General American Life Insurance Company v. Central National Bank of Cleveland,* 136 F.2d 821, 823 (6th Cir.1943). We do not, however, believe that it is accurate for Johns-Manville to state that the trial court failed to properly consider and rule on defendant's motion for a new trial. The court did pass upon defendant's motion for judgment notwithstanding the verdict, or in the alternative, for a new trial or remittitur. Defendant's motion was denied and the clerk was instructed to enter judgment in favor of plaintiff for the verdict amount. Implicit in that instruction is the fact that defendant's motions were denied.

█ The decision of a trial judge to deny a motion for a new trial should be reversed only on the showing of an abuse of discretion. *Hannah v. Haskins,* 612 F.2d 373 (8th Cir.1980). Similarly, the trial judge, in ruling on the sufficiency of the evidence in a motion for a new trial, is afforded broad discretion by a reviewing court. *See Music Research, Inc. v. Vanguard Recording Society,* 547 F.2d 192 (2d Cir.1976). Since Johns-Manville has not demonstrated that the trial judge abused his discretion, we find no merit in this argument and accordingly affirm the trial judge's denial of the motion for a new trial.

*Evidentiary Rulings*

Next we address Johns-Manville's argument that the trial court committed various prejudicial errors in admitting incompetent evidence, irrelevant evidence and evidence which was unduly prejudicial. Specifically, Johns-Manville contends that the trial court committed reversible error in admitting four categories of evidence. We will briefly address each category of evidence. At trial, the court admitted into evidence certain documents commonly called the "Sumner Simpson Papers." Johns-Manville complains that the court "apparently" held that it was collaterally estopped to deny the authenticity of those documents because they were found to be authentic in a proceeding before the United States District Court in South Carolina, and that the court subsequently misapplied the doctrine of collateral estoppel. We do not agree.

On March 24, 1982, a hearing was held before Judge Porter, in chambers, by telephone communication with the attorneys for the parties. During the course of the hearing, the court admitted the Sumner Simpson Papers as "admissible or relevant to the issue of notice and punitive damages." Joint Appendix at A–40. (Transcript of Pretrial Conference (March 24, 1982)). The court stated further that "We were advised this morning of a late filing of that by Mr. Gillenwater indicating a court ruling elsewhere that these were admissible as ancient documents. But, in any event our ruling is the same. It will be the same as it was in the Bunch case and was in the Bollinger case. So, we will—if there's any reason why we should depart from that ruling, we'll take another look at it." *Id.* at 40–41.

Federal Rule of Evidence 901 provides: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." The trial judge obviously found that the evidence provided by Cavett was sufficient to support a finding that the Sumner Simpson Papers were authentic. On the record before us we cannot say that the trial judge abused his discretion in so ruling. Accordingly we find that the trial court did not err in admitting the Sumner Simpson Papers into evidence.

█ Johns-Manville also complains that the trial court improperly and without proper authentication admitted into evidence two letters from Dr. Daniel Braun to Hugh Jackson, the so called "Braun Letters".

We note that in the companion case also before this Court, *Cathey v. Johns-Manville,* Johns-Manville admitted the authenticity of the letters while denying their admissibility. *See* Appellees Brief at Appendix 2, Appendix 3. Apparently, it was this admission of authenticity which lead the trial court to admit the Braun Letters into evidence. *See* Joint Appendix at A–218–20.

Before this Court, Johns-Manville contends that there may be strategic reasons for not contesting the admissibility of evidence in one case and denying the admissibility of that same evidence in another case. While this may well be true, we believe that once a definitive ruling on the authentication of the evidence was made in the *Cathey* case and this ruling was brought to the attention of the court, Johns-Manville was obligated to somehow rebut the force of that prior admission. On the record before us we find no contradictory evidence which effectively challenges the authenticity of the Braun Letters and thus, we cannot say that the trial judge abused his discretion in this respect. Accordingly, we find that the trial court did not err in admitting the Braun Letters into evidence.

■ Johns-Manville also complains that the trial court improperly allowed a defense witness, Mr. William Reitze, to be cross-examined concerning the labeling of asbestos fiber shipping bags. On direct examination Mr. Reitze testified concerning defendant-appellant's labeling of its asbestos-containing products and was allowed to read a caution label exemplar into evidence. Mr. Reitze also testified concerning changes made in the caution labels by Johns-Manville as a result of the passage of Occupational Safety and Health Administration Law and the implementation of various OSHA regulations.

On cross-examination, and over Johns-Manville's objections, Mr. Reitze testified that as a member of Johns-Manville's Labeling Review Committee, he was involved in the determination of the suitability of the present warning labels used with asbestos fiber and products containing asbestos

fiber. Our review of the record convinces us that this cross-examination is within the subject matter of the direct examination and therefore proper under the Federal Rules of Evidence. *See* Fed.R.Evid. 611(b). Accordingly, we find that the trial court did not err in allowing the cross-examination of Mr. Reitze.

Johns-Manville also complains that the trial court erred in allowing into evidence the deposition testimony of its former Medical Director, Dr. Kenneth Smith. Further, Johns-Manville specifically objected to two portions of Dr. Smith's deposition concerning: a conversation between Dr. Smith and the Medical Director of Canadian Johns-Manville, and the labeling of Johns-Manville's diatomaceous earth products.

■ Johns-Manville contends that the statement by the Medical Director of Canadian Johns-Manville, Dr. Stephenson was irrelevant hearsay, unduly prejudicial, and should have been excluded. When taken within the context from which it came, however, the relevance of the statement of Dr. Stephenson becomes apparent. Dr. Smith testified concerning his knowledge of the relationship between the inhalation of asbestos fibers and the development of asbestosis in persons other than employees of Johns-Manville, specifically civilians not exposed occupationally to asbestos. Dr. Smith related the story of his conversation with Dr. Stephenson as but one early facet of the development of that knowledge. We believe such knowledge by a Johns-Manville employee is relevant to the issue of Johns-Manville's knowledge of the hazards associated with exposure to airborne asbestos fibers.

■ Federal Rule of Evidence 804(b)(3) provides, in part:

**Rule 804(b) Hearsay exceptions.** The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

\* \* \* \* \* \*

(3) **Statement against interest.** A statement which was at the time of its making so far contrary to the declarant's

pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true.

Given the context of Dr. Stephenson's statement, and considering his position as Medical Director of Canadian Johns-Manville, we believe Dr. Stephenson's statement fits within this hearsay exception and we hold that the trial court did not err in allowing this testimony.

Johns-Manville also claims that the trial court erred in allowing in evidence the testimony of Dr. Smith concerning the labeling of diatomaceous earth, since such testimony is irrelevant to the issues concerning asbestos products. In arguing for the admission of this evidence, we believe that counsel for Mr. Cavett adequately demonstrated the relevance of this evidence by pointing out:

> [T]he purpose of the inquiry concerning diatomaceous earth was that they labeled the diatomaceous earth, and the studies on diatomaceous earth were done after the studies, initial studies were done on asbestos, and the hazards of asbestos were established even before the hazards of diatomaceous earth, and yet they put the warning labels on diatomaceous earth and not asbestos. That's the significance of it.

Joint Appendix at A–175.

■ With respect to many of these evidentiary issues Johns-Manville has complained that the trial court erred by admitting prejudicial evidence and thereby deprived it of a fair trial. We do not agree. Under Federal Rule of Evidence 403 the admission of allegedly unduly prejudicial evidence is placed within the sound discretion of the trial judge. *See In re Beverly Hills Fire Litigation*, 695 F.2d 207, 217–18 (6th Cir.1982), *cert. denied*, 461 U.S. 929, 103 S.Ct. 2090, 77 L.Ed.2d 300 (1983). Consequently, a trial judge's ruling will not be overturned unless he has clearly abused his discretion. *See id.; United States v. Johnson*, 558 F.2d 744, 746 (5th Cir.1977), *cert.*

*denied*, 434 U.S. 1065, 98 S.Ct. 1241, 55 L.Ed.2d 766 (1978). Since we find that the trial judge has not abused his discretion, we accordingly uphold the various evidentiary rulings made by the trial judge.

*Ten Year Statute of Repose*

Last, we address Johns-Manville's argument that it has a vested right in the ten year statute of repose contained in the Tennessee Products Liability Act, as originally enacted, which constitutionally could not be abrogated by the retroactive application of the amendment removing asbestos cases from the purview of the statute of repose. The Tennessee Products Liability Act of 1978, Tenn.Code Ann. §§ 29–28–101 thru 29–28–108, became effective on July 1, 1978. As originally enacted, Section 29–28–103 provided:

> Any action against a manufacturer or seller of a product for injury to person or property caused by its defective or unreasonably dangerous condition must be brought within the period fixed by §§ 28–3–104, 28–3–105, 28–3–202 and 47–2–725, but notwithstanding any exceptions to these provisions it must be brought within six (6) years of the date of injury, *in any event, the action must be brought within ten (10) years from the date on which the product was first purchased for use or consumption*, or within one (1) year after the expiration of the anticipated life of the product, whichever is the shorter, except in the case of injury to minors whose action must be brought within a period of one (1) year after attaining the age of majority, whichever occurs sooner. (emphasis added).

Within a year of its effective date, however, this statute was amended by the enactment of Section 29–28–103(b) which provided: "the foregoing limitation of actions shall not apply to any action resulting from exposure of asbestos." This amendment, making the ten year statute of repose inapplicable to asbestos-related injuries became effective on July 1, 1979.

Mr. Cavett, was first told and therefore first discovered that he was suffering from an injury as result of his exposure to asbestos on approximately November 4, 1981, as a result of a letter from his treating physician Dr. William K. Swann. *See* Joint Appendix at A–144. The plaintiff filed his complaint and the action was commenced on December 4, 1981. Since the plaintiff's cause of action arose and accrued in November 1981, after the effective date of the July 1, 1979, amendment to the Tennessee Products Liability Act, the application of that amendment to the present action is not violative of Article I, Section 20 of the Tennessee Constitution, dealing with retrospective laws. *See Clay v. Johns-Manville Sales Corp.,* 722 F.2d 1289, 1291–92 (6th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 3537, 82 L.Ed.2d 842 (1984); *McCroskey v. Bryant Airconditioning Co.,* 524 S.W.2d 487, 490 (Tenn.1975). Thus, there has been no retrospective application.

▆▆▆ Due to the fact that Cavett's cause of action accrued after the effective date of the amendment, Johns-Manville, neither acquired nor developed a vested right. It is the time of the accrual of an action which determines the applicable statute of limitations. *McCroskey v. Bryant Airconditioning Co.,* 524 S.W.2d at 490; *Watts v. Putnam County,* 525 S.W.2d 488 (Tenn. 1975); *Teeters v. Currey,* 518 S.W.2d 512 (Tenn.1974).

▆▆▆ As this Court has stated, there are several exceptions to the Tennessee statute imposing the ten year limit on bringing actions against a manufacturer or seller. The third exception to the general ten year limit was adopted by the 1979 amendment to the act by the addition of subsection (b) which excepts "any action resulting from exposure to asbestos." *Mathis v. Eli Lilly and Co.,* 719 F.2d 134, 136 (6th Cir.1983). Further, this Court stated that in tort claims there is no cause of action and, therefore, no vesting of property rights until an injury actually occurs. 719 F.2d at 141.

The present case is distinguishable from the cases cited by Johns-Manville, for the proposition of its vested rights. In each of these cases cited by the defendant, including *Murphree v. Raybestos-Manhattan, Inc.,* 696 F.2d 459 (6th Cir.1982), the injuries were discovered and therefore the causes of actions accrued during a time that the statutes of repose or limitations were in effect. In the present case, however, since the cause of action accrued after the effective date of the July 1, 1979 amendment, excepting the asbestos claims from the ten year statute of repose, no vested rights arguments exist. Accordingly, we hold the plaintiff was therefore not limited in proving exposures to Johns-Manville products first purchased after July 1, 1969, and the trial court was correct in so ruling.

## CONCLUSION

Having considered and rejected each of the arguments raised by Johns-Manville on this appeal, this Court concludes that the trial court was correct in its various rulings and properly entered judgment upon the jury's verdict.

Accordingly, the judgment of the Honorable David S. Porter is hereby affirmed.

## II.

## CATHEY v. JOHNS–MANVILLE SALES CORPORATION

This products liability action was originally commenced by plaintiffs Elmer L. and Martha Jo Cathey, citizens of Tennessee, against 23 defendants, alleged to be citizens of states other than Tennessee, in Davidson County (Tennessee) Circuit Court on November 29, 1977. That action was voluntarily dismissed by the plaintiffs in March 1981, pursuant to Rule 41 of the Tennessee Rules of Civil Procedure, and the instant action was filed in United States District Court for the Middle District of Tennessee on March 27, 1981. Federal jurisdiction was based upon diversity of citizenship. 28 U.S.C. § 1332 (1982).

In their complaint the plaintiffs alleged that the defendant, Johns-Manville, and the other defendants manufactured, distributed and sold asbestos-containing insulation

products. Plaintiffs alleged that these products were defective and unreasonably dangerous, and therefore, that the defendant manufacturers were liable under a theory of strict liability in tort. In the alternative, the plaintiffs contended that the defendants negligently manufactured and sold such products. At trial, however, the plaintiffs abandoned the negligence count and proceeded only on strict liability, and the jury was charged only on strict liability.

Prior to trial, the plaintiffs settled with defendants Nicolet, Inc., H.K. Porter Co. and Southern Textile Co., and orders of compromise and dismissal were entered. On November 27, 1981, defendants moved *in limine* for the court to strike plaintiffs' claim for punitive damages. At a pretrial conference of December 11, 1981, the court orally granted defendants' motion, and an order granting defendants' motion was entered on the same day.

On May 19–21, 24–27, and June 1–2, 1982, the case was tried to a jury against the remaining defendants: Johns-Manville Sales Corporation, Owens-Corning Fiberglass Corporation, Celotex Corporation, Raybestos-Manhattan, Inc., Owens-Illinois, Inc., GAF Corporation, Fibreboard Corporation, Pittsburgh Corning Corporation, and Unarco Industries, Inc., in the United States District Court for the Middle District of Tennessee before the Honorable Thomas A. Wiseman, Jr. At the close of plaintiff's proof, a directed verdict was entered in favor of GAF Corporation and Fibreboard Corporation. At the close of all proof, a directed verdict was entered in favor of Owens-Illinois.

Following deliberation, the jury returned a verdict in favor of Mr. Cathey against defendant Johns-Manville for $12,000 in compensatory damages. The jury found in favor of all other defendants, i.e. Celotex, Owens-Corning, Raybestos-Manhattan (Raymark) and Pittsburgh Corning, as to Mr. Cathey's claims, and found in favor of all defendants as to Mrs. Cathey's loss of consortium claim. Judgment pursuant to this verdict was entered by the court on June 2, 1982.

Following the trial, plaintiffs filed a motion for new trial or in the alternative an additur and defendant Johns-Manville filed a motion to alter or amend the judgment. Both of these motions were denied by the district court. On June 24, 1982, plaintiffs filed a notice of appeal, and defendant, Johns-Manville filed its notice of appeal on July 1, 1982.

On August 28, 1982, defendant, Johns-Manville filed a voluntary petition for reorganization under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.*, in the United States Bankruptcy Court for the Southern District of New York. Pursuant to that filing, defendant Owens-Corning, Inc. filed a motion with this Court that all proceedings in this appeal be stayed pursuant to the automatic stay provisions of the Bankruptcy Code, 11 U.S.C. § 362. *See Cathey v. Johns-Manville Sales Corp.*, 711 F.2d 60 (6th Cir.1983). On November 1, 1983, the bankruptcy court issued an order lifting the automatic stay for the limited purpose of allowing this appeal to proceed.

On plaintiff's motion, Martha Jo Cathey was substituted as the sole plaintiff in this case due to the death of her husband, Elmer L. Cathey, on October 21, 1983. In addition, the plaintiff's appeal and the appeal of Johns-Manville were consolidated pursuant to the procedure of this Court for cross-appeals.

In 1951, Mr. Cathey began a career as an insulation worker. Starting as an insulator's helper in 1951, Mr. Cathey became an insulator in 1958 and continued insulation work until 1980. In April 1980, he was forced to quit work because of shortness of breath.

Mr. Cathey first discovered he was suffering from asbestosis in November 1977, when he received a letter from Dr. Irving J. Selikoff of the Mount Sinai School of Medicine in New York. This letter informed Mr. Cathey of the results of a physical examination conducted by Mount Sinai the previous year.

Dr. Eugene Wolcott testified at trial that he had been the family physician of Mr.

Cathey since 1966. Dr. Wolcott hospitalized the plaintiff in November 1977 because of complaints with shortness of breath, coughing and tightness of the chest. He was discharged with a diagnosis of asbestosis and early emphysema secondary to asbestosis. Dr. Wolcott expressed the opinion that Mr. Cathey had asbestosis with moderate to severe breathing impairment.

Dr. James Haynes, a pulmonary specialist in Nashville, Tennessee, testified that through his physical examinations, reviews of the x-rays, pulmonary function studies and diffusion studies of Mr. Cathey, that the plaintiff had asbestosis. This asbestosis was a major contributor to Mr. Cathey's physical impairment which prevented him from doing any heavy work.

Dr. Gerritt Schepers, a medical officer with the Veterans Administration, who has published many articles on asbestos and its related diseases, reviewed the medical records, x-rays, CT scans, and pulmonary function studies of Mr. Cathey. Dr. Schepers rendered the opinion that Mr. Cathey had moderately severe asbestosis which had further resulted in complications of recurrent infection and right side heart enlargement. Dr. Schepers further testified that because of the asbestosis, Mr. Cathey had incurred a markedly increased risk of developing cancer and that Mr. Cathey's occupation as an insulator caused this asbestosis.

At the time of trial Mr. Cathey was fifty-one years old, with a life expectancy of 22.55 years. Mr. Cathey testified that as an insulator's helper and insulator, he was exposed on a daily basis to different types of insulation products during the preparation of the cements and the applications of the pipe insulation and block insulation. These products contained asbestos. Mr. Cathey testified that it was not until 1976 that he became aware that asbestos may be harmful. He testified that he never knew to use a respirator or any type of protection until 1976 or 1977.

Both at trial and in the briefs on this appeal the parties have presented extensive evidence concerning the state of the art and the level of knowledge about the hazards associated with the manufacture and use of asbestos-containing products. However, in contrast to the previously addressed companion case, *Cavett v. Johns-Manville*, many of the items of evidence which there supported an award of punitive damages, were not allowed to come into evidence in this case.

The pleadings submitted in this case were voluminous. As we read the pleadings there are essentially seven issues raised for review by this Court:

WHETHER THE DISTRICT COURT ERRED IN RULING THAT UNDER TENNESSEE LAW PUNITIVE DAMAGES MAY NOT BE AWARDED IN AN ACTION BASED ON STRICT PRODUCTS LIABILITY IN TORT;

WHETHER THE DISTRICT COURT ABUSED ITS DISCRETION IN RULING THAT THE DEPOSITIONS OF DR. KENNETH SMITH, THE DECEASED FORMER MEDICAL DIRECTOR FOR THE DEFENDANT, JOHNS-MANVILLE, WERE INADMISSIBLE;

WHETHER THE DISTRICT COURT ABUSED ITS DISCRETION IN RULING THAT CERTAIN EXHIBITS WERE INADMISSIBLE;

WHETHER THE DISTRICT COURT ABUSED ITS DISCRETION IN RULING THAT DURING HIS TESTIMONY THE PLAINTIFF, MR. CATHEY, COULD NOT REFER TO A SO-CALLED MANUFACTURERS PRODUCTS EXPOSURE LIST, WHICH HAD BEEN COMPLIED BY HIS WIFE;

WHETHER THE DISTRICT COURT ERRED IN GRANTING DIRECTED VERDICT FOR THE DEFENDANTS, GAF CORPORATION, OWENS-ILLINOIS, INC., AND FIBREBOARD CORPORATION;

WHETHER THE DISTRICT COURT ERRED IN ENTERING JUDGMENT UPON THE JURY'S VERDICT IN FAVOR OF DEFENDANTS, CELOTEX CORP., OWENS-CORNING FIBERGLASS CORP., RAYBESTOS-MAN-

HATTAN, INC. AND PITTSBURGH–CORNING CORP.;
WHETHER THE DISTRICT COURT ERRED IN NOT REDUCING THE JUDGMENT AGAINST THE DEFENDANT, JOHNS–MANVILLE, BY THE AMOUNTS PAID TO THE PLAINTIFFS BY OTHER MANUFACTURERS OF ASBESTOS–CONTAINING PRODUCTS.

*Punitive Damages*

As was noted above, prior to trial the district court granted the defendant's motion *in limine* to exclude plaintiff's claim for punitive damages. In ruling on the motion at a pretrial conference on December 11, 1982, the court stated: "I think punitive damages are inconsistent with 402A suits and particularly in the asbestosis cases where there are multiple plaintiffs suing essentially the same defendants on the same theory. Punitive damages are inappropriate, so that motion will be granted." Joint Appendix at 79.

From our previous discussion in *Cavett v. Johns-Manville, see supra* at 1569–71, concerning the availability of punitive damages in a product liability case, it is clear we do not agree. Rather than repeat the substance of our discussion on this issue from *Cavett,* we will only focus upon two arguments of ten raised to challenge the propriety of punitive damages in Tennessee products liability suits. First, it is often argued, as it was apparently before the trial court here, that under Tennessee law the recovery of punitive damages is inconsistent with the theory underlying a strict product liability action founded upon Section 402A of the Restatement (Second) of Torts. In essence this argument contends that in a 402A products liability action the principal inquiry concerns the condition of the product and the conduct of the tort feasor is largely irrelevant. Whereas, by contrast, under Tennessee law a recovery of punitive damage is warranted only where the tort feasor has engaged in some type of oppressive conduct. *Compare Wyatt v. Winnebago Industries, Inc.,* 566 S.W.2d 276, 279 (Tenn.App.1977), *cert. denied,* (Tenn.1978) ("This theory of recovery in products liability cases really imposes 'strict' liability only in the sense that the nature of the defendant's conduct in dealing with the defective product, that is, whether he acted intentionally, negligently, or innocently, is not important on the issue of his liability.") *With Johnson v. Husky Industries, Inc.,* 536 F.2d at 650 ("Under Tennessee law punitive damages may only be awarded in cases involving fraud, malice, gross negligence or oppression, where a wrongful act is done with a bad motive or so recklessly as to imply a disregard for social obligations, or where there is such wilfull misconduct or entire want of care as to raise a presumption of conscious indifference to consequences.").

We believe a passage from an article by a legal commentator fully rebuts this so-called incompatibility argument, and quote approvingly therefrom:

The incompatibility argument has some superficial appeal, but for several reasons does not withstand analysis. First, its primary contention that liability in strict tort precludes consideration of a defendant manufacturer's fault is highly dubious. In fact, rather than dispensing with the notion of fault from products liability law, strict tort theory expands it by extending the legal consequences of fault to the "innocent" manufacture of defective products in a manner analogous to negligence per se. Yet even acknowledging that strict tort eliminates the requirement of proving a manufacturer's fault, this is so only with respect to establishing liability for compensatory damages. *As a liability doctrine designed to compensate product accident victims for their actual losses, strict tort theory has never purported to delimit the remedies that might be appropriate if a plaintiff's accident is attributable to some aggravated fault of the manufacturer.*

Second, the incompatibility argument rests upon the invalid assumption that punitive damages claims must be established by facts identical to those supporting the underlying claim for compensatory damages. This assumption was repu-

diated over a century ago in *Fleet v. Hollenkemp,* [52 Ky. 219 (1852),] the earliest reported products liability case involving punitive damages. Addressing the question of whether punitive damages could be awarded in an action brought in case as well as in trespass, the court responded "[W]hether exemplary damages should or should not be given does not depend upon the form of action so much as upon the extent and nature of the injury done and the manner in which it was inflicted, whether by negligence, wantoness [sic], or with or without malice. In another early punitive damages case in which the defendant raised the trespass-case distinction, the court remarked that "[s]uch [a] distinction would be as arbitrary and unjust, as it is technical." Punitive damages claims have long been deemed compatible with the negligence cause of action despite the fact that considerably more, sometimes different, proof is required to establish that a defendant's conduct was "wilful and wanton" or "malicious" rather than merely negligent. The first modern products liability case to address the incompatibility argument in the context of an action brought in strict tort, *Drake v. Wham-O Manufacturing Co.,* [373 F.Supp. 608 (E.D.Wis.1974)] similarly concluded as follows: "Where the principal claim is based on strict liability in tort and there is an additional claim of wanton disregard of the plaintiff's rights, it is a simple matter to allow the plaintiff to make a supplementary showing of aggravating conduct for the purpose of proving entitlement to punitive damages." The *Drake* court reasoned that this was an appropriate approach since "a claim for punitive damages is considered a prayer for a specific type of relief in Wisconsin, not a part of the claim itself...."

Moreover, punitive damages awards have been held appropriate in a number of cases involving various other causes of action based on strict principles of liability, including nuisance, trespass to land and liability for ultra-hazardous activities, negligence per se, defamation, and implied warranty in the sale of drugs. In light of this established use of punitive damages in strict liability cases generally, and because there is no sound reason for not allowing a plaintiff seeking punitive damages to show a greater culpability for that purpose than he must for his underlying theory of compensatory liability, the incompatibility argument should be rejected.

Owens, *Punitive Damages in Products Liability Litigation,* 74 Mich.L.Rev. 1257, 1269–71 (1976) (footnotes omitted) (emphasis added).

Second, it is sometimes contended that under Tennessee law, punitive damages are designed primarily to deter a *specific* wrongdoer from future misconduct. Given this specific deterence rationale, it is then argued that the sheer multitude of products liability suits that these defendants currently have pending are sufficient deterence and punishment for their alleged wrongdoing. We do not agree with this limited reading of Tennessee law.

In *Lazenby v. Universal Underwriters Insurance Company,* 214 Tenn. 639, 383 S.W.2d 1 (1964), the Tennessee Supreme Court discussed the doctrine of punitive damages under Tennessee law and stated:

In such cases the interest of society and of the agreed [sic] individual are blended and such damages are allowed as punishment for such conduct and as an example or warning to the one so guilty, *and others,* in order to deter *them* from committing like offenses in the future.

214 Tenn. at 646, 383 S.W.2d at 4 (emphasis added). While the Tennessee court clearly views the deterence of the particular wrongdoer as one of the goals to be served by the imposition of punitive damages, it is not the only goal. A plain reading of the italicized portions of the above quoted passage clearly shows that general deterence, *i.e.* making an example of a particular wrongdoer so as to deter others from similar misconduct, is also a goal of punitive damages under Tennessee law. Further, this quoted passage is not an isolated or unintended statement concerning the law

or punitive damages in Tennessee, rather it represents the considered view of the highest courts in the state spanning over a period of better than 100 years. *E.g., Bryson v. Bramlett,* 204 Tenn. 347, 351, 321 S.W.2d 555, 557 (1958) ("Where fraud, malice, gross negligence or oppression intervenes, the law blends the interest of society and of the aggrieved individual, and gives damages such as will operate as an example or warning to the party *or others* to deter them from similar transactions.") (emphasis added); *Knoxville Traction Co. v. Lane,* 103 Tenn. 376, 389, 53 S.W. 557, 560 (1899) (same); *Polk, Wilson & Co. v. Fancher,* 38 Tenn. (1 Head) 336, 341 (1858) (same); *Breault v. Friedli,* 610 S.W.2d 134, 136 (Tenn.App.1980) ("By way of legal background, punitive or exemplary damages are intended to punish the defendant for his wrongful conduct *and to deter others from similar conduct in the future.*") (emphasis added).

Thus, we hold that under Tennessee law an asbestos products liability claimant potentially could receive punitive damages. Since the trial court disallowed Mr. Cathey's claim for punitive damages in a pretrial motion, we vacate the judgment of the district court and remand this matter for a new trial.

*Instructions Upon Remand*

Since the judgment of the district court has been vacated and the matter remanded for a new trial we will not address, in detail, the remaining issues presented upon appeal. We will, however, attempt to provide the district court with a few instructions in order to assist it in retrying this very complicated case.

*Parties*

As an initial matter we would note that from the record before this Court we cannot determine whether or not it is necessary to include all of the parties in the new trial. It is possible that some of the evidence Cathey would have presented in support of his claim for punitive damages may have also supported a compensatory recovery. However, since the trial judge is in a far better position to initially make such an assessment, we suggest that as a prelimi-

nary matter the trial court determine which of the numerous parties are to be included in the new trial.

*Deposition of Dr. Smith*

Next, with respect to the deposition of Dr. Kenneth Smith, we would alert the district court that in both the companion case decided today, *Cavett v. Johns-Manville Sales Corp.,* and in the recent case of *Clay v. Johns-Manville Sales Corp.,* 722 F.2d 1289 (6th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 3537, 82 L.Ed.2d 842 (1984), this Court has upheld the admissibility of Dr. Smith's deposition. Since the instant case was tried before our ruling in *Clay,* the district court did not have the benefit of this Court's decision at the time it ruled to exclude the Smith deposition. Further, until the district court has determined which parties need to be included in the retrial of this case, it cannot be assumed that the probative value of this evidence will be outweighed by the danger of unfair prejudice or confusion of the issues. Accordingly, upon remand, the trial court is instructed to reconsider the admissibility of the Smith deposition.

*Evidentiary Exhibits*

On appeal Cavett objects to the decision of the trial court to exclude three categories of evidentiary exhibits: the so-called Sumner Simpson Papers, the so-called Owens-Corning Documents and certain Workers' Compensation case files. In light of our decision vacating the prior decision in order to allow Cavett to present a claim for punitive damages, the trial court is instructed on remand to also reconsider these evidentiary rulings.

*Plaintiff's Exposure List*

In preparation for trial, Mr. Cathey, who was illiterate, and his wife developed a listing of all the products manufactured by the defendants to which he was allegedly exposed. This exposure list was compiled by Mrs. Cathey reading the name of a product to Mr. Cathey, who would then indicate if, in his thirty years of working as an insulator, he had been exposed to the product, and, if so, when and where.

On appeal plaintiff claims the trial court erred by not allowing Elmer Cathey to

refer to his exposure list during his testimony, in order to refresh his recollection. We believe that the district court's ruling was correct. We also believe that the plaintiff suffered no actual prejudice from this ruling, because the court allowed him to refresh his recollection while on the stand by viewing photographs and boxes of the defendant's products.

The ostensible purpose of the exposure list was to provide the defendants, during discovery, with a definitive listing of the asbestos-containing thermal insulation products to which the plaintiff claimed exposure, and the time and place of such exposure. It was not intended to be used as a substitute for live testimony concerning alleged product use.

In discussing Mr. Cathey's exposure list it is important to keep in mind that Elmer Cathey was illiterate. Given that Mr. Cathey was unable to read, it is difficult to understand how a written exposure list could have assisted him in refreshing his recollection concerning "a matter about which ... [he] once had knowledge but now has insufficient recollection to enable him to testify fully and accurately...." Fed.R.Evid. 803(5).

The trial judge recognized that Mr. Cathey could not read, and allowed plaintiff's counsel to question him with the assistance of product packages and actual packaging material itself—all in an effort to assist Mr. Cathey in refreshing his recollection. The judge told plaintiff's counsel that because of Mr. Cathey's illiteracy he would allow them to show product boxes and pictures to their client in order to refresh his recollection about the various products he used. During direct examination plaintiff's counsel showed Mr. Cathey at least ten photographs of product boxes, and bags, and eight actual product containers. Further, the court told plaintiff's counsel, when Mr. Cathey became confused during his testimony, "You may lead him."

In his brief, plaintiff states that the court's refusal to allow counsel to question Mr. Cathey from the exposure list precluded counsel for Mr. Cathey from using the names on the list to refresh his recollection—"which would have enabled Mr. Cathey to testify fully and accurately...." Appellant's Brief at 36. Plaintiff claims that this denied him the right to fully and fairly present this case to a jury. Appellant's Brief at 37.

However, Mr. Cathey was allowed to view not only photographs of insulation containers, but also the actual containers themselves. Seemingly this would have refreshed his recollection more than the opportunity to examine a list which he could not read. To allow counsel to read the list to Mr. Cathey we believe would have been impermissible leading of the witness.

Plaintiff argues that under the proper application of Federal Rule of Evidence 803(5) Mr. Cathey should have been allowed to use the exposure lists to refresh his recollection. However, on its face, the rule would appear to be inapplicable to the exposure list because they were not "made or adopted by the witness when the matter was *fresh* in his memory." Fed.R.Evid. 803(5).

> Rule 803(5) allows the use in Court of: A memorandum or record concerning the matter about which a witness once had knowledge, but now has insufficient recollection to enable him to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in his memory and to reflect that knowledge correctly.

Mr. Cathey's exposure list, however, would seem to fail to meet the criteria of Rule 803(5) in at least two major respects.

First, the list was not "made or adopted by the witness when the matter was fresh in his memory." As Judge Weinstein notes in his treatise, "Rule 803(5) seeks to ensure that the witness correctly recorded his knowledge when he remembered what he perceived." 4 *Weinstein's Evidence*, ¶ 803(5)[01], at 803–163. Mr. Cathey made his list after litigation had commenced. In it, he refers to alleged exposure as far back as 1951, and to none more recent than 1976, several years prior to preparing the list. Thus, the freshness requirement of Rule 803(5) would not seem to be met.

Second, under the rule, the memorandum should "reflect ... [the] knowledge correctly." Mr. Cathey offered little evidence to show that his exposure list correctly reflected fresh knowledge about product use or exposure. As the trial judge observed, the list was prepared by Mr. Cathey "under your [his attorney's] suggestive influence and the insistence of his wife." Although the trial judge inquired about the existence of any proof to corroborate the list, plaintiff had no evidence to support the contention the list correctly reflected Mr. Cathey's actual exposure.

The admission of items pursuant to Rule 803(5) is justified only because "a contemporary, accurate record is inherently superior to a present recollection subject to the fallability of human memory." 4 *Weinstein's Evidence,* ¶ 803(5)[01] at 803–158. Mr. Cathey's list was not at all contemporary, and testimony at trial cast substantial doubt upon its accuracy.

In sum, we believe the trial judge was correct in not allowing Mr. Cathey to testify from his exposure list and we uphold his ruling on this issue.

*Reduction of Judgment*

The jury returned a verdict in favor of Mr. Cathey against Johns-Manville for compensatory damages in the amount of $12,000 and the district court entered judgment accordingly. Johns-Manville filed a motion to alter or amend the judgment pursuant to the Tennessee Uniform Contribution Among Tort-Feasors Act, Tenn.Code Ann. § 29–11–105 (1980), seeking to reduce the judgment by any amounts paid to plaintiffs in settlement of their claims against other asbestos manufacturers. The district court summarily denied Johns-Manville's motion, and the Company filed a motion to reconsider and to allow discovery regarding plaintiff's settlements with codefendants and other manufacturers. In support of the motion Johns-Manville filed the affidavits of its attorney and the attorneys for other manufacturers of asbestos-containing products, indicating that the plaintiffs had settled with such manufacturers for at least $27,000. The district court again summarily denied the motion. On its cross-appeal Johns-Manville argues that in so ruling the district court erred and that under Tennessee law it was entitled to a credit or set-off of any amounts paid plaintiffs as settlement of their claims against the codefendants and other asbestos manufacturers.

The Tennessee Uniform Contribution Among Tort-Feasors Act provides in pertinent part:

*Effect of release or covenant not to sue upon liability of other tort-feasors:*

(a) When a relief or covenant not to sue or not to enforce judgment is given in good faith to one or two or more persons liable in tort for the same injury or the same wrongful death.

(1) It does not discharge any of the other tort-feasors from liability for the injury or wrongful death unless its terms so provide, *but it reduces the claim against the others to the extent that any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it,* whichever is the greater....

Tenn.Code Ann. § 29–11–105 (emphasis added).

We believe the Tennessee statute directly applies to the situation at bar. Accordingly, the district court is instructed that upon retrial of this matter it is to reduce any judgment rendered against Johns-Manville by the amount paid in settlement by the other defendants.

## CONCLUSION

Having considered the arguments of the parties in this cross-appeal, the decision of the district court is vacated and the matter is remanded for a new trial in conformity with this opinion.