Dolores M. MORAN, Executrix of the Estate of Edward P. Moran, Deceased, Plaintiff-Appellee,

v.

JOHNS–MANVILLE SALES CORP., Defendant-Appellant.

No. 81–3373.

United States Court of Appeals, Sixth Circuit.

Argued May 24, 1982.

Decided Oct. 26, 1982.

Thomas P. Mulligan, Michael A. Nims, Jones, Day, Reavis & Pogue, Cleveland, Ohio, Lively M. Wilson, Stites, McElwain & Fowler, Louisville, Ky., for defendant-appellant.

Robert E. Sweeney, Thomas Terry, Sweeney, Mahon & Vlad, Cleveland, Ohio, for plaintiff-appellee.

Before MARTIN, Circuit Judge, and PECK and BROWN, Senior Circuit Judges.

JOHN W. PECK, Senior Circuit Judge.

In this diversity action, Johns-Manville Sales Corp. ("JM") appeals from a judgment for the plaintiff, and from the trial court's denial of JM's motions for judgment notwithstanding the verdict ("JNOV"), for a new trial, and for a remittitur. On appeal, JM attacks the sufficiency of the evidence at trial to support the jury's award of $350,000 in compensatory and $500,000 in punitive damages. JM also offers policy arguments against any award of punitive damages in this case.

Edward Moran, the plaintiff's deceased, worked for over thirty years installing insulation. During that time he worked with asbestos insulation products made by JM's corporate predecessors. Moran died of lung cancer at age sixty-one. His executrix prosecuted this action against various manufacturers of asbestos products under a theory of strict liability in tort.

## I. SUFFICIENCY OF THE EVIDENCE

Strictly speaking, this Court does not review the actions of juries. Our review of the sufficiency of the evidence is by review of a trial judge's rulings on motions

1. In Ohio, only what is stated in a syllabus or in an opinion per curiam or by the court represents a pronouncement of law by the Supreme

for directed verdict or JNOV. In diversity cases within this Circuit, this Court resolves questions of the sufficiency of the evidence by applying the test of sufficiency under state law. *E.g., Chumbler v. McClure,* 505 F.2d 489, 490 (6th Cir. 1974); *Moskowitz v. Peariso,* 458 F.2d 240, 244 (6th Cir. 1972). Under the test in Ohio, the forum state, an issue is in the province of the jury "when there *is* sufficient evidence relating to that issue to permit reasonable minds to reach different conclusions on that issue...." *E.g., O'Day v. Webb,* 29 Ohio St.2d 215, 215, 280 N.E.2d 896, 897 (1972).[1] The test is not whether the trial judge would grant a new trial on the weight of the evidence. *E.g., Hamden Lodge v. Ohio Fuel Gas Co.,* 127 Ohio St. 469, 469, 189 N.E. 246, 246 (1934).

A. Motions for Directed Verdict and JNOV

JM first argues that there was insufficient evidence that it knew or should have known of health hazards to insulation workers like Mr. Moran. JM's knowledge (or duty to discover) is relevant under the following rules governing strict product liability under Ohio law:

"1. One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

"(a) the seller is engaged in the business of selling such a product, and

"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold. "2. The rule stated above applies although the seller has exercised all possible care in the preparation and sale of his product, and the user or consumer has not bought the product from or entered into any contractual relation with the seller." *Temple v. Wean United, Inc.,* 50 Ohio St.2d 317–19, 364 N.E.2d 267–69 (1977) (drawing from *Restatement (Second) Torts,* § 402A).

Court. *State ex rel. Canada v. Phillips,* 168 Ohio St. 191, 191, 151 N.E.2d 722, 724 (1958).

These rules are modified in the case of unavoidably unsafe products: the Supreme Court of Ohio has refused to hold the manufacturer of a prescription drug strictly liable to a consumer when the manufacturer has provided to the medical profession adequate warnings of the dangers of the drug. See *Seley v. G. D. Searle & Co.,* 67 Ohio St.2d 192, 192, 423 N.E.2d 831, 834 (1981). "A warning is adequate where, under all the circumstances, it reasonably discloses all risks inherent in the use of the drug of which the manufacturer, being held to the standards of an expert in the field, knew or should have known to exist." *Id.* syllabus 2. This adequacy is a question of fact. *Id.*

The parties both look to *Seley* for the legal principles relevant to liability in this case. Thus, they apparently agree that asbestos insulation material is an "unavoidably unsafe product," and that Ohio law would not impose strict product liability on its manufacturers unless they failed to provide the warnings required by *Seley.*

JM contends that there is insufficient evidence that it knew or should have known of the health hazards to installers of asbestos insulation before 1964, when it first began to put warning labels on that product. JM argues that the "state of the art," that is, the state of knowledge of experts in the field, was not shown by Moran to include knowledge of the health risks to workers such as himself. JM's conclusion is that Moran thus failed to show that its insulation products were "defective," even without warning labels.

■ We find Moran's evidence of known or knowable risks to insulation workers to be ample. By deposition testimony, the late Dr. Kenneth Smith, a former medical director at JM, testified that he was aware of the "association" between lung cancer and inhalation of asbestos fibers in the late 1940's; he further testified that he was aware of the cancer "hazard" from the inhalation of fibers by the late 1950's. Smith stated that he had recommended placing labels on asbestos-containing products as early as 1952 or 1953. In his opinion, the decision by JM not to use such labels then was purely a "business decision." Another chief witness for Moran was Dr. Joseph Wagoner, an epidemiologist. Dr. Wagoner surveyed the medical literature relating to the hazards of asbestos and concluded that by 1953 there was "well advanced information" showing a "cancer problem" in the use of asbestos-containing insulation.

Cross-examination of these witnesses tended to show that causal connections between lung cancer and use of asbestos products were not established with any certainty before JM began using warning labels. Yet, as Justice Sweeney noted in his opinion in *Seley:*

> A jury may find that a warning is inadequate and unreasonable even where the existence of a "risk," i.e., a causal relationship between use of the .product and resulting injury, has not been definitely established. Thus, where scientific or medical evidence exists tending to show that a certain danger is associated with the use of the drug, the manufacturer may not ignore or discount that information in drafting its warning solely because it finds it to be unconvincing. 67 Ohio St.2d at 198, 423 N.E.2d at 837 (citations omitted).

If a jury may find a warning inadequate in such circumstances, then, a fortiori, it may find the absence of a warning unreasonable. Judge Wisdom has put it very well: a duty to warn attaches, not when scientific certainty is established, but "whenever a reasonable man would want to be informed of the risk in order to decide whether to expose himself to it." *Borel v. Fibreboard Paper Prods. Corp.,* 493 F.2d 1076, 1089 (5th Cir. 1973), *cert. denied,* 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974).

JM relies particularly on the "Fleischer-Drinker"[2] study, published in 1946, to rebut Moran's assertion that the state of the art embraced knowledge of health hazards to

---

**2.** Fleischer, Viles, Gade & Drinker, *A Health Survey of Pipe Covering Operations in Con-* structing *Naval Vessels,* 28 J. Indus. Hygiene & Toxicology 9 (1946).

insulation workers before JM began putting warning labels on asbestos insulation. This study, conducted at U. S. Navy and government contract shipyards by three Navy officers and one member of the U. S. Maritime Commission, concluded that naval "pipe covering is not a dangerous occupation." Fleischer-Drinker at 16. Comparatively few of the workers studied by Fleischer and Drinker, however, had had long-term exposures to asbestos dust—a point made by Dr. Wagoner in his direct testimony for the plaintiff. Moreover, the authors of the study noted that if pipe coverers worked steadily at jobs producing high concentrations of asbestos dust—such as band sawing—a "considerably greater" incidence of asbestosis could be expected. Fleischer-Drinker at 16. In short, the Fleischer-Drinker study need not have been considered by the jury to epitomize the state of the art, nor to excuse JM's failure to place earlier warnings on its insulation products.

■ JM next argues that the evidence at trial did not support an award of punitive damages. JM states that Ohio law requires that "actual malice"—which JM apparently equates with ill-will—be established before punitive damages may be awarded. This is not the law of Ohio as stated by the Ohio Supreme Court or as construed by this Court. The Ohio Supreme Court recently summarized the "malice" justifying punitive damages thus:

> Evidence of actual malice . . . must be present before a jury question of punitive damages is raised; actual malice may take either the form of the defendant's express ill will, hatred or spirit of revenge, or the form of reckless, willful or wanton behavior which can be inferred from surrounding circumstances. *Detling v. Chockley,* 70 Ohio St.2d 134, 137–38, 436 N.E.2d 208, 210–11 (1982) (per curiam). *Accord, Drayton v. Jiffee Chem. Corp.,* 591 F.2d 352, 365–66 (6th Cir. 1978); *Gillham v. Admiral Corp.,* 523 F.2d 102, 108 (6th Cir. 1975) (applying Ohio law).

In the product liability action of *Leichtamer v. American Motors Corp.,* 67 Ohio St.2d 456, 456 at syllabus 2, 424 N.E.2d 568, 570–71 (1981), the Ohio Supreme Court held that "[p]unitive damages may be awarded where a manufacturer's testing and examination procedures are so inadequate as to manifest a flagrant indifference to the probability that the product might expose consumers to unreasonable risks of harm." By analogy to *Leichtamer* we hold that a jury question of punitive damages was established if a reasonable juror could have concluded that JM's failure to place warning labels on insulation products before 1964 manifested such a "flagrant indifference" to users' risks of harm.

To rebut Moran's evidence of flagrant indifference to risks to insulation workers, JM argues that the record discloses that the Selikoff study of 1964[3] was the first to document health risks to *users,* rather than *producers,* of asbestos products. This assertion is belied by the summary of prior knowledge given in the Selikoff study itself:

> Ellman in 1934 mentioned a case of asbestosis in an insulation worker. Other cases were subsequently reported, and in the annual report of the Chief Inspector of Factories for the year 1956, "lagging," or insulation work, was recognized as hazardous. Similarly, Hervieux in France drew attention in 1962 to the dangers of such end product use as insulation work. The only large scale survey of asbestos insulation workers was undertaken in the U. S. by Fleischer *et al.* in 1945. They found only three cases of asbestosis and concluded that "asbestos pipe covering of naval vessels is a relatively safe operation." Unfortunately, 95 per cent of those examined by them had worked for less than 10 years at the trade and, as we shall see, evaluation of the risk of insulation workers limited to study of men with relatively short durations of exposure may be misleading. Selikoff at 140 (footnotes omitted).

3. Selikoff, Churg & Hammond, *The Occurrence of Asbestosis Among Insulation Workers in the* *United States,* 132 Ann. N.Y. Acad. Sci. 139 (1965).

■ In judging whether a manufacturer's indifference to consumers' risks is "flagrant" we believe a jury may weigh the gravity of the harms threatened against the onerousness of the manufacturer's correctives. Here the harms threatened were chronic debilitating diseases; the corrective was the placement of warning labels on insulation products so that insulation workers might try to protect themselves if they so chose. Under the limited standard of review we may employ, we cannot disturb the jury's award of punitive damages in this case.

We stress that we now hold only that a reasonable jury could have decided this case on this evidence as this jury did. We do not hold that every jury presented with the same evidence would be constrained to reach the same results. See *Migues v. Fibreboard Corp.,* 662 F.2d 1182, 1189 (5th Cir. 1981).

### B. New Trial Motion

■ JM moved not only for a JNOV, but, in the alternative, for a new trial. On a new trial motion, unlike on a motion for JNOV, the trial court may weigh the evidence. *E.g., TCP Indus., Inc. v. Uniroyal, Inc.,* 661 F.2d 542, 546 (6th Cir. 1981). The decision to grant or deny a new trial is one "confided almost entirely to the exercise of discretion on the part of the trial court." *E.g., Allied Chem. Corp. v. Daiflon, Inc.,* 449 U.S. 33, 36, 101 S.Ct. 188, 66 L.Ed.2d 193 (1980); *accord, TCP Indus., supra,* 661 F.2d at 546 (citing cases). In light of the substantial evidence supporting the jury verdict, which we have summarized above, we can find no abuse of discretion in the denial of JM's motion for a new trial.

### II. POLICY ARGUMENTS AGAINST PUNITIVE DAMAGES AWARD

■ JM offers numerous reasons why an award of punitive damages would be inappropriate in this case. The first is that the goals of punishment and deterrence would not be served by awarding "punitive" damages. JM argues that "there is no conduct to deter because Johns-Manville modi-fied its products in the 1960's." In Ohio, however, the deterrence sought by punitive damages is general, not specific: the offending party is set up "as an example *to others* that they might be deterred from *similar* conduct." *Detling, supra,* 70 Ohio St.2d at 136, 436 N.E.2d at 209 (emphasis added); see also 30 OJur 3d, *Damages,* § 148 (citing cases). Whether a defendant's particular course of conduct has ceased is irrelevant to the accomplishment of this broader purpose.

In *Drayton v. Jiffee Chem. Corp.,* 591 F.2d 352, 365–66 (6th Cir. 1978), we affirmed a district court's refusal to award punitive damages in a product liability case. The trial court had noted both improving industry practices, and a change in corporate ownership, as weighing against such an award. See 395 F.Supp. 1081, 1097–98 (N.D.Ohio 1975). The trial court's action may be questioned in light of later Ohio precedent; moreover, our own affirmance, by a divided court, was lukewarm. See 591 F.2d at 365–66, 371–74. *Drayton* was a case tried to the bench, and it was key to this Court's affirmance that "the trial judge's decision not to award punitive damages was based upon considerations of both law and fact." *Id.* at 365. We also noted the trial judge's *factual* characterization of the plaintiffs' arguments for punitive damages as " 'more shrill than persuasive'." *Id.* at 366. Finally, we invoked Rule 52(a), Fed.R.Civ.Pro., a pellucid indication that a *factual* determination was being left undisturbed. See 591 F.2d at 366. Nothing we said in *Drayton* requires us to disallow punitive damages in this case.

■ JM contends that no culpable party would be punished by an award of "punitive" damages here. It points out that the persons responsible for the business decisions giving rise to JM's liability have long ago left JM's employ. We noted in *Gillham* that, under Ohio law, a corporation may be "subjected to punitive damages for the tortious acts of its agents within the scope of their employment in any case where a natural person acting for himself would be liable for punitive damages." 523 F.2d at 108.

JM would have us overlook the liability of the legal person. We decline to adopt the boundless principle that legal entities may escape liability for punitive damages if the "culpable" persons are no longer agents of the corporation. It is agency at the time of the tortious act, not at the time of litigation, that determines the corporation's liability. JM's rule would make the corporate veil an impenetrable shield against punitive damages; JM points to nothing in Ohio law from which such a shield could be fashioned.

■ We are not dissuaded from allowing punitive damages because this cost will ultimately be borne by "innocent" shareholders. Punitive damage awards are a risk that accompanies investment. *Shimman v. Frank,* 625 F.2d 80 (6th Cir. 1980) did not establish a contrary rule. In that case we reduced, but did not eliminate, an award of punitive damages against a union; we noted that "the ones who will end up paying for the punitive damages award are the union members. For this reason, courts should be slow to award huge punitive damages awards against unions." *Id.* at 103 (fn. omitted). The case of a union member and shareholder are, however, not wholly analogous. Individual workers only seldom can choose which union to belong to; a group of workers cannot change bargaining agents overnight. Investors may typically place their money where they choose and withdraw it when they wish. The prospect of ultimate liability for punitive damages may encourage investors to entrust their capital to the most responsible concerns.

■ JM urges with particular force that punitive damages should not be awarded against a company that faces a multitude of product liability actions. If punitive damages are awarded in many of these actions, JM argues that it will not be punished, but destroyed. We have read Judge Friendly's interesting essay on such a prospect, and its implications for the law, in *Roginsky v. Richardson-Merrell, Inc.,* 378 F.2d 832, 838–41 (2d Cir. 1967). However eloquent the essay, it is confessed dictum. Judge Friendly noted that "the New York cases

afford no basis for our predicting that the [New York] Court of Appeals would adopt a rule disallowing punitive damages in a case such as this, and the *Erie* doctrine wisely prevents our engaging in such extensive law-making on local tort liability, a subject which the people of New York have entrusted to their legislature and, within limits, to their own courts, not to us." *Id.* at 841. So it is here. The relief sought by JM may be more properly granted by the state or federal legislature than by this Court. Such legislative relief is even now being sought by asbestos-product manufacturers. See 68 A.B.A.J. 398 (April 1982); New York Times, Aug. 10, 1982, at 34.

### III. TRIAL ERROR

■ JM raises only one supposed trial error—allowing the court reporter to reread to the jury, on its request after retiring, the deposition testimony of Dr. Smith. The decision whether to allow rereading of testimony is one that "lies almost exclusively in the good judgment of the judge presiding." *United States v. DePalma,* 414 F.2d 394, 396 (9th Cir. 1969), *cert. denied,* 396 U.S. 1046, 90 S.Ct. 697, 24 L.Ed.2d 690 (1970). The trial court did not abuse this wide discretion: the first reading of the deposition came long before the case was sent to the jury; further, it had been read into the record by two lawyers, and, as the district court noted, such evidence does not make the same lasting impression as a live witness.

On this point, JM's citation of *Henry v. United States,* 204 F.2d 817 (6th Cir. 1953), is inapt. In that case mechanically recorded testimony was replayed for the jury, but the jury was also favored with a rehearing of the trial judge's earlier castigation of a witness as untruthful. There was no judicial comment on the weight or trustworthiness of the testimony reread in this case.

The judgment of the district court is affirmed. Costs to appellee.