**NILSON–NEWEY AND COMPANY, a Utah General Partnership, Plaintiff–Appellee,**

v.

**Ray L. BALLOU, Defendant–Appellant.**

No. 86–5309.

United States Court of Appeals, Sixth Circuit.

Argued July 28, 1987.

Decided Feb. 18, 1988.

Robert L. Milby, argued, Hamm, Milby and Ridings, London, Ky., for defendant-appellant.

* The Honorable Herman Weber, United States District Judge for the Southern District of Ohio,

Robert Houlihan, Jr., argued, Stoll, Keenon and Park, Lexington, Ky., Perry M. Bentley, for plaintiff-appellee.

Before KENNEDY and NELSON, Circuit Judges, and WEBER, District Judge.[*]

DAVID A. NELSON, Circuit Judge.

The defendant in this legal malpractice action is a lawyer who, notwithstanding a glaring conflict of interest, represented both the purchaser and an interested middleman in a Kentucky land transaction. When the lawyer prepared a legal description of the property for the purchaser, he left out the acreages of the individual parcels comprising the tract and failed to advise the purchaser that the parcels seemed to contain only about half as many acres, *in toto*, as the purchaser thought. As a result, the purchaser went through with an acquisition that would not otherwise have been made.

After the acquisition had been completed, the purchaser learned of an adverse mineral rights claim that led to the expenditure of considerable time and money in an action to quiet title. The purchaser sued the lawyer in federal court, where jurisdiction existed because of diversity of citizenship, and the jury rendered a verdict for the purchaser in the amount of $375,000. The defendant lawyer has appealed.

Finding no merit in the lawyer's assignments of error, we shall affirm the judgment that was entered for the plaintiff on the verdict of the jury.

**I**

During the late 1970s the price of coal escalated sharply; investor interest in land on which it was thought coal deposits might be discovered increased correspondingly. Mr. Darrell Nilson, a principal of the plaintiff partnership in this case, was an investor who had such an interest. Learning of a tract of land in Knox County,

sitting by designation.

Kentucky, that he thought might be promising, Nilson, a resident of Utah, came east to see about buying it.

Nilson met with a man named Lester Dugger, who was acquainted with the owner of the land, a Mr. Gambrel. Dugger told Nilson that he would like to buy the property himself, but because he lacked the money to do so he said he would be willing to arrange for Gambrel to sell it to Nilson. Dugger suggested that Gambrel was a suspicious man who would not sell to an outsider, and Dugger offered to act as a straw, buying the property on Nilson's behalf. In exchange for his services, Dugger said he wanted a share of the proceeds of any future coal mining operations; he represented that this would be his only compensation.

Dugger and Nilson went out to look at the property, Dugger describing supposed coal deposits and telling Nilson that there were between 700 and 1,000 acres of land in the Gambrel tract. Nilson made no independent investigation of Dugger's claims.

Nilson returned to Utah, and after discussing the investment opportunity with his partner, Nilson spoke by telephone with Dugger and Dugger's lawyer, Defendant Ray Ballou. In the course of the telephone conversation the parties worked out an understanding that was then memorialized in a letter agreement.

On October 18, 1977, Nilson returned to Kentucky, accompanied by his Utah lawyer, to meet with Dugger and Ballou. The parties discussed their letter agreement, in which Dugger had represented to Nilson that there were 700 acres in the tract. The Nilson partnership was to pay $250,000 for the land, and Dugger was prohibited from receiving any compensation other than a prescribed share of the proceeds from future coal mining. Nilson emphasized two concerns at the meeting: he wanted to make sure that the tract contained at least 700 acres, and he wanted to make sure that the partnership was getting clear title to the property.

Ballou told Nilson that he was qualified to do the necessary title work. Although Nilson and his lawyer knew that Ballou was also Dugger's attorney, Nilson entrusted Ballou with the title work and went back to Utah to raise the money. Some people named Brasher provided the entire $250,000, and the Nilson Partnership assumed an obligation to repay half that amount.

Meanwhile, Ballou went about his title work. How deeply he dug into it may be open to question. A competent search would have revealed that the tract of land being offered by Gambrel appeared to contain substantially less than the 700 acres Nilson thought he was getting. The testimony of Mr. J.T. Cline III, the plaintiff's expert, indicates that approximate acreage amounts were set forth in the title documents for the individual parcels comprising the Gambrel tract, and that the total of these amounts was only 357 acres. Ballou either ignored the acreage amounts set forth in the documents he had undertaken to examine, or he chose not to inform Nilson and the Brashers of the discrepancy. His title opinion stated: "Due to the inaccuracy of the acreage shown on the deeds, it is impossible to determine the acreage involved without a survey."

The deed prepared by Ballou omitted any reference to acreage. Mr. Cline testified that this was not normal:

"Q57. Mr. Cline, Mr. Milby has pointed out the difference between the contract that said 700 acres and the deeds that didn't say anything about acreage. Now, is it a normal practice, when running a title from a contract being the point of departure that you eliminate the acreage call when you draft a deed?

A. No, it is not.

Q58. Did you notice anything else unusual about the way in which the descriptions were translated from the old source deeds into the deed that Mr. Ballou prepared?

A. Yes; Mr. Ballou drew up two deeds. One was the James Gambrel to Doris Dugger and Doris Dugger to Brashear [sic]. And the deed from James Gambrel to Doris Dugger, that is where it is described as parcel one, parcel two,

parcel three, parcel four, parcel five, parcel six. In particular, when you describe parcel five, the reference to the 152 acres, that deed was, when conveyed to James by the Commissioner in 1940, had a legal description at the end of which—a part of a legal description had the best boundary description in that it contained 152 acres. When that description—James to Doris Dugger, the boundary descriptions, and the phrase indicating 152 acres was deleted, taken out."

In addition to ignoring or concealing the actual acreage, Ballou failed to disclose, and presumably failed to find out, that a purchaser buying the Gambrel tract with an eye toward coal mining might well be buying a lawsuit. In 1909 a man named Lincoln Gambrel had granted the mineral rights to a portion of his land to McCall Land Company. This grant of mineral rights was reflected in the land records in such a way that it would have been impossible, without doing a survey, to determine whether or not the mineral rights were included in the tract Nilson intended to buy. Ballou's title opinion contained no reference to the grant of mineral rights to the McCall Land Company.

On October 25, 1977, Nilson returned to Kentucky for the closing. Concurring in Dugger's judgment that Gambrel would not deal with an outsider, Ballou left Nilson in a room in the Knox County courthouse where Gambrel would not observe him. Ballou then joined Dugger and witnessed Dugger's purchase of the tract of land from Gambrel. The purchase price was $150,000. Dugger and Ballou then went to retrieve Nilson, and Dugger conveyed the land to Nilson. The price Nilson paid Dugger was $250,000. Ballou, who knew the price terms of both transactions, had been present at the October 18 meeting where it was agreed that Dugger would make no profit except on production of coal—yet Ballou said nothing to his client Nilson about the secret $100,000 profit that was being pocketed by his client Dugger.

After acquiring the land, Nilson arranged with Resource Coal Company to begin prospecting. Resource was promptly evicted by McCall Land Company, which claimed that it owned the mineral rights by virtue of the 1909 grant from Lincoln Gambrel. Ultimately a surveyor named Bob Fentress determined that the McCall mineral rights did not extend to Nilson's tract. Nilson also learned from this survey that his tract contained only 363.25 acres.

McCall disagreed with Fentress' findings as to the extent of its mineral rights, and the Nilson partnership brought quiet title litigation that was not completed until 1983, when this court affirmed a district court finding in favor of the partnership. The partnership incurred substantial legal expenses in connection with its suit against McCall.

The action that is the subject of the present appeal was commenced against the Duggers (husband and wife) and against the Gambrels (estate and wife of James Gambrel) on February 26, 1979. Ballou was not named as a defendant in the original complaint. Ballou suggests that this was because Nilson wanted to secure his cooperation in the McCall litigation. Be that as it may, an amended complaint was filed on August 27, 1979, naming Ballou as an additional defendant. The McCall case was pending in the district court at the same time, and the instant case was not pressed until after the conclusion of the McCall action.

A bifurcated trial on the liability of Ballou alone was conducted before a jury in November of 1985. The jury found that Ballou was negligent, but after a trial on the damage phase the jury could not reach a decision as to how much the partnership was entitled to recover. A second trial on damages was conducted before a new jury, and that jury found that the plaintiff partnership was entitled to $375,000. Of this amount $213,700 was "[t]he amount by which the purchase price exceeded the actual value of the property"; $130,000 represented the "[l]oss of the use of [the $213,700] awarded ... above"; and $31,300 represented "[t]he cost of defending the title against the McCall mineral claim."

## II

On appeal, Ballou complains initially of certain "procedural errors." He says first that he was unfairly surprised when the trial court permitted the plaintiff partnership to make an issue of his failure to discover the McCall mineral rights claim. If Ballou was surprised, however, it can only have been because he failed to read the pleadings. The original complaint stated that while the sellers told Nilson that they had good, unimpaired title to the land, "the McCall Land Company has asserted the rights to any and all minerals located in or on said real property." The amended complaint said of Ballou that

"(i) In the course of examining the title to said real property, said defendant discovered or in the exercise of reasonable skill and care should have discovered the existence of a claim or of the basis for a possible claim to the mineral rights to said real property by the McCall Land Company.

"(ii) Said defendant failed to disclose to the plaintiff or the Brashers the existence of such claim or of the basis for such possible claim by the McCall Land Company."

The second alleged "procedural error" involves the introduction of evidence tending to show that Ballou might have been guilty of defrauding Nilson. Whatever the evidence in question may show as to fraud, all of it was also relevant to issues other than fraud—issues such as Ballou's knowledge of the nature of the transaction, the standard of conduct normally to be expected of lawyers, and Ballou's failure to live up to that standard. The plaintiff was entitled to make the case that had been pleaded, and this necessarily involved a showing that Ballou was guilty of unprofessional conduct. Any resultant "prejudice" was not the result of the evidence per se, but of Ballou's unprofessional conduct.

The last of the alleged "procedural errors" was the refusal of the district court, during the damages phase of the trial, to let Ballou show that Nilson's loss "was due to Nilsen's [sic] own folishness [sic] rather than because of any act or omission by Ballou." It is apparent, however, that Ballou waived any contributory negligence defense by failing to plead it and by failing to raise it during the liability phase of trial. Cf. *Mitchell v. United States*, 396 F.2d 650 (6th Cir.1968) (per curiam) (contributory negligence is an affirmative defense under Kentucky law.)

Ballou counters by arguing that the evidence was admissible on the issues of causation and mitigation of damages. The "mitigation of damages" contention must fail because the duty to mitigate arises only after the defendant's tortious conduct, not before it. The "causation" contention fails because causation was at issue in the liability phase of the trial, not the damages phase. Cf. *Hilen v. Hays*, 673 S.W.2d 713, 720 (Ky.1984), where comparative or contributory negligence seems to have been regarded as relevant to the issue of proportionate liability rather than to the issue of what the total damage amounted to.

## III

The second issue on appeal is whether the damages were properly calculated. This issue breaks down into three parts: whether it was appropriate to take as a measure of damage the amount by which the purchase price exceeded the value of the property, whether damages were recoverable for loss of the use of that amount, and whether Ballou could be taxed with the cost of the McCall Land Company litigation.

### A

The jury was asked to award the plaintiff partnership the amount by which the purchase price ($250,000) exceeded the value of the property; the jury concluded that the excess came to $213,700. Ballou argues that this is an incorrect measure because there was no way for him to have known whether there was any coal on the land, and the large difference between what the plaintiff paid and what the land was actually worth reflects, in part, the difference between the value of land thought potentially to be coal-bearing and

the value of land known to be without coal. Nilson paid $250,000 for what he thought was 700 acres of land on which he hoped to find coal, in other words, and what he got was 363.25 acres of land that had no coal on it.

It is not Ballou's fault that the land turned out to have no coal, but it is Ballou's fault that the plaintiff bought the land. Had it not been for Ballou's negligence (*i.e.,* had Ballou told Nilson about the deficiency in acreage and about the McCall interest), Nilson would not have bought the land at all. Nilson testified at trial to that effect, and given the deference that must be accorded the jury's verdict, we have no basis for thinking otherwise. If Nilson had not bought the land, he would not have lost any money on the deal; he would not have lost anything because of the lack of coal deposits, just as he would not have lost anything because he got only half the acreage he bargained for. On these facts, we are inclined to think the Kentucky courts would have approved the measure of damages applied by the district court in this case.

Ballou cites *Wiedeman v. Brown,* 307 Ky. 231, 210 S.W.2d 764 (1948), where a man bought what he thought was thirty acres of farmland with a few buildings on it. The thirty acres turned out to be twenty-six. The Kentucky Court of Appeals approved the use of a measure of damages different from that used here; taking the total amount paid by the buyer and subtracting the value of the buildings to get the value of the unimproved land, the Kentucky court divided the latter amount by the number of acres the buyer thought he had purchased. The resulting "per acre" price was then multiplied by four, that being the number of acres by which the buyer had been shorted, and this was said to be the amount of the buyer's damage.

If such a method had been used in the case at bar, the award would have been substantially less. Nilson paid $250,000 for what he thought was approximately 700 acres of unimproved land, so he intended to pay $357.14 per acre. He only got 363.25 acres, which meant that he paid $357.14 per acre for 336.75 acres that he did not get. Under the *Wiedeman* approach, Nilson's damages would have been not $213,700, but 336.75 × $357.14, or $120,267.85.

Nilson's partnership seeks to distinguish *Wiedeman* on the ground that the instant case "is not a farm land purchase case like *Wiedeman* in which the damage to the buyer occurred because he received fewer acres than he thought he was buying. Rather, Nilson–Newey was damaged because it would not have bought the Gambrel property *at all* had it known the facts negligently omitted from Ballou's title opinion."

■ We agree. We also observe that the court in *Wiedeman* twice noted that the parties had acted in "good faith." *Wiedeman,* 210 S.W.2d at 765–66. In the case at bar, we have an attorney who (if the jury is to be believed)[1] acted in violation of his professional obligations. We find no error in the $213,700 award.

### B

■ As to the award of damages for the partnership's loss of the use of the money tied up in this transaction, there is a long line of Kentucky authority leaving the decision on such questions in the hands of the trial court. "We have long held in Kentucky 'that interest runs as a matter of right on a liquidated demand, and, in the case of an unliquidated claim, the allowance of interest rests in the discretion of the jury or the court trying the case.' *Middleton v. Middleton,* 287 Ky. 1, 152 S.W.2d 266 (1941)." *City of Henderson Police and Fireman Pension Board v. Riley,* 674 S.W.2d 27, 33 (Ky.App.1984). The award of pre-judgment interest on the unliqui-

**1.** In reviewing the factual findings of the jury in this diversity case, we must apply the standard of review that the Kentucky courts would use. *Moran v. Johns–Manville Sales Corp.,* 691 F.2d 811, 813 (6th Cir.1982). Kentucky applies a clearly erroneous standard to the factual findings of juries. See *Moskowitz v. Peariso,* 458 F.2d 240 (6th Cir.1972). We can find no clear factual error here.

dated claim in the case at bar was not an abuse of discretion.

### C

■ Ballou also claims that it was improper for the partnership to be awarded the cost of clearing the title with respect to the McCall mineral claim. As far as we can discern, the only pertinent Kentucky authority is that cited by the partnership, *Indiana National Life Insurance Co. v. Butler*, 186 Ky. 81, 215 S.W. 949 (1919). In *Butler* the court noted that

> "The prevailing rule seems to be that the reasonable expenses of prior litigation caused by the wrongful act of another, including compensation for attorneys' fees, may be recovered where the party incurring them acted in good faith in bringing his action or making defense." *Id.* at 83, 215 S.W. at 950.

See also Restatement (Second) of Torts § 914(2) ("One who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person is entitled to recover reasonable compensation for loss of time, attorney fees and other reasonable expenditures thereby suffered or incurred in the earlier action."). In the present case the jury was specifically asked to determine whether the various items of alleged damages were a "direct and proximate result of the negligence of defendant, Ray Ballou." By assessing damages against Ballou for the cost of the McCall litigation, the jury found that this cost was "caused by the wrongful act" of Ballou. *Butler*, 215 S.W. at 950. We affirm on this point as well.

### IV

■ Ballou's final contention is that the disclaimer in his title opinion should serve to insulate him from any liability for his misconduct. The disclaimer said: "Due to the inaccuracy of the acreage shown on the deeds, it is impossible to determine the acreage involved without a survey." Ballou would have this phrase exculpate him even though he examined—and his client Nilson did not examine—title records af-

firmatively indicating that the tract contained not 700 acres, but only about 357 acres.

Ballou's contention is refuted by *Owen v. Neely*, 471 S.W.2d 705 (Ky.1971). Land records involved in that case showed that a piece of property was an isosceles triangle with one leg 14 poles long and two legs 17 poles long. A survey on which the Owens relied showed the short leg to be 17 poles long and the other legs 22 poles long. As a result of the defective survey, and the failure of the Owens' attorney, Mr. Neely, to uncover the problem, the Owens bought a house that encroached upon the land of a neighbor.

> "Among his defenses Mr. Neely pleaded that the accuracy of the survey from which the description in his title report was taken was not a matter concerning which he made any certification, that in fact his certificate was made expressly 'subject to any information that would be revealed by an accurate survey of the real estate and subject to any information that would be revealed by a personal inspection of the premises,' that the description was based on a survey made by John T. Ligon at the request of the plaintiffs, and that if it was inaccurate they are estopped." *Owen*, 471 S.W.2d at 707.

The question facing the Kentucky Court of Appeals was "whether the facts thus far developed show conclusively that Mr. Neely is protected by the reservation contained in his title certificate." The court expressed itself on that question thus:

> "We are of the opinion that a lawyer certainly may protect himself by reservations and disclaimers expressly set forth in a certificate of title, *but only if he has no reasonable grounds to suspect the actual existence of defects not mentioned*. The average layman is not familiar with and ordinarily does not understand legal descriptions, and *if his lawyer, accidentally or otherwise, receives information that should reasonably put him on notice of a defect we think it is his duty to investigate or report it*

*to his client." Owen,* 471 S.W.2d at 708 (emphasis supplied).

Defendant Ballou had ample grounds to suspect that the tract his client Dugger was trying to get Nilson to buy—at a price that would yield Dugger a hidden and unauthorized profit of $100,000—had nothing like the acreage Nilson thought it had. Nilson was Ballou's client too, even if he did hail from Utah, and Ballou's duty to investigate or report the discrepancy to Nilson was hardly discharged by telling Nilson that the acreage could not be determined without a survey because of a supposed "inaccuracy" in acreage figures,[2] where Ballou had seen the figures, Nilson had not seen them, and Ballou conveniently omitted the figures from the title description that Nilson would see.

The judgment of the district court is in all respects AFFIRMED.

---

**2.** The "inaccuracy," as it turned out, was less than 2%. The survey ultimately showed that the tract contained 6¼ acres *more* than the 357 acres shown in the underlying title records.