928 F.2d 1132
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Casimir M. CYBULA, Plaintiff-Appellee,
v.
DETROIT AND MACKINAC RAILWAY COMPANY, Defendant-Appellant.
 No. 90-1562.
 United States Court of Appeals, Sixth Circuit.
 March 27, 1991.
 
 On Appeal from the United States District Court for the Eastern District of Michigan, 88-74390, Duggan, J.
 E.D.Mich.
 AFFIRMED.
 Before BOYCE F. MARTIN, Jr. and MILBURN, Circuit Judges; and WELLFORD, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Detroit and Mackinac Railway Company ("the railroad") appeals from a judgment entered upon a jury verdict for the plaintiff, Casimir Cybula, in a case brought under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. Secs. 51-60. For the reasons that follow, we affirm.
 
 I.
 
 2
 Casimir Cybula started work for the railroad in 1976 and worked in a variety of positions, including trackman, machinist helper, machinist crane operator, and hossler, until February of 1988 when he became disabled. Cybula testified that he had often been required to kneel on corrugated steel and other hard surfaces to perform the various jobs assigned him by the railroad through the years, although it was not until the middle of 1987 that he noticed any pain or discomfort in his knees.
 
 
 3
 According to his testimony, Cybula told Rich Van Buskirk, the railroad's general manager and vice president, about the soreness in his knees sometime in 1987. In February of 1988, while still on the job, he complained about pain in his knees to his shop supervisor, William Wright, who promptly sent him to a doctor. The course of his medical treatment eventually included surgical irrigation of both knees, medications, and two arthroscopic surgeries on his left knee. The treatment failed to rehabilitate Cybula, and the railroad's company doctor finally declared him disabled because he could no longer kneel without debilitating pain.
 
 
 4
 At trial, Cybula presented the testimony of Dr. Robert Ike, who stated that the act of kneeling constituted a repeated trauma to the knee and that the kneeling done by Cybula in the course of his job could have contributed to the damage found in his knee joints. However, there were factors other than kneeling involved in the damage. When Dr. Ike was asked about the possibility of other contributing factors, he replied:
 
 
 5
 Well, I mentioned previously that the calcium chlorophosphate crystals, the calcium crystals that were observed in his knee joint fluid and in his cartilage on arthroscopy are an indicator of an abnormal--of a pre-existing abnormality of cartilage that's most likely inherited; so all of the things that we have spoken about contributing to his knee arthritis may not have given him near as much disability had he not had that abnormal cartilage to begin with.
 
 
 6
 J.A. 53.
 
 
 7
 On the question of whether knee pads or knee protection of some kind might have reduced the damage from kneeling or delayed the onset of the arthritis, Dr. Ike opined:
 
 
 8
 Well, my best medical guess is it only would have delayed things probably because he had so much working against him. I'd like to emphasize that the fact that he has calcium deposits in his cartilage says that his cartilage is different from that of a normal person not because it was beat up; it was likely something inherited. So he didn't have the--he didn't have the resiliency of cartilage that normal people have so he was likely to develop knee arthritis in an earlier stage.
 
 
 9
 J.A. 46.
 
 
 10
 The doctor also made it clear that Cybula's failure to wear knee pads was not the sole cause of his degenerative arthritis.
 
 
 11
 Q. Is it also your opinion, sir, that therefore you cannot say that any failure to wear pads was the contributing cause of the arthritis that Mr. Cybula was suffering from?
 
 
 12
 A. Right. I don't think we can ever identify a single contributing cause. We can only suppose certain contributing factors in an attempt to modify those ones which are modifiable.
 
 
 13
 J.A. 56.
 
 
 14
 As to the availability of knee pads that might have lessened the damage to Cybula's knees, there was testimony by Howard Bischoff, a machinist employed by the railroad company, to the effect that hard-shelled knee pads of the kind carpet layers use had been available in the storeroom for at least five years. Cybula testified that he had not been aware that such knee pads were available. J.A. 106-07. Thus, it appears from the uncontradicted testimony that knee pads were available, that Cybula did not know of their availability, that their use by him might have diminished the damage to his knees by delaying the onset of the acute phase of his arthritis, and that he was predisposed to the condition he developed because of an abnormality, most probably inherited, that manifested itself by the presence of calcium chlorophosphate crystals in the fluid and cartilage within his knees.
 
 
 15
 At the close of the plaintiff's proof, the railroad moved for a directed verdict in its favor. The motion was denied, and the railroad offered no proof at all. After hearing argument of counsel and the charge of the court, the jury, after duly deliberating, returned a verdict for Cybula for $817,700. The railroad timely filed a motion for judgment notwithstanding the verdict ("J.N.O.V.") and, in the alternative, a motion for new trial, all pursuant to Rule 50(b), Federal Rules of Civil Procedure. These motions were denied by the district court and this timely appeal followed.
 
 
 16
 The railroad raises three related issues in its appeal. First, it insists that there was no evidence of negligence on its part and that, therefore, its motions for directed verdict and J.N.O.V. were erroneously denied. Second, it claims that the district court erred in allowing the case to go to the jury with instructions that the defendant railroad company had a duty to provide safety equipment to the plaintiff. The railroad does not challenge the instruction per se, and, as shall be shown, this issue is really a restatement of the first. Finally, the railroad contends that the district court erred in failing to grant a new trial because the verdict was against the clear weight of the evidence.
 
 II.
 A.
 
 17
 The railroad argues that the district court erred in failing to direct a verdict in its favor at the close of the evidence and in failing to grant J.N.O.V. because it further argues that there is no evidence of negligence in the record. Because verdicts directed at the close of the evidence and judgments notwithstanding the verdict are but two species of directed verdicts, the standard for granting and denying them is the same and obtains both at trial and on appeal. Sawchik v. E.I. DuPont DeNemours & Co., 783 F.2d 635, 636 (6th Cir.1986). This standard is a strict one:
 
 
 18
 Viewing the evidence in the light most favorable to the party against whom the motion is made, a directed verdict is proper if reasonable minds could only come to a conclusion against the non-movant. In coming to this conclusion neither the credibility or weight of the evidence should be considered.
 
 
 19
 Littlejohn v. Rose, 768 F.2d 765, 770 (6th Cir.1985), cert. denied, 475 U.S. 1045 (1986).
 
 
 20
 Because this case was brought under the Federal Employers' Liability Act, 45 U.S.C. Secs. 51-60, there are some important threshold considerations. The operative language of 45 U.S.C. Sec. 51 provides:
 
 
 21
 Every common carrier by railroad ... shall be liable in damages to any person suffering injury while he is employed by such carrier ... for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier....
 
 
 22
 (Emphasis added).
 
 
 23
 The Supreme Court has held that this language severely restricts the judicial review of questions concerning sufficiency of the evidence in FELA cases.
 
 
 24
 Under this statute the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought.... Judicial appraisal of the proofs to determine whether a jury question is presented is narrowly limited to the single inquiry whether, with reason, the conclusion may be drawn that negligence of the employer played any part at all in the injury or death.
 
 
 25
 Rogers v. Mo. Pac. R.R., 352 U.S. 500, 506 (1957).
 
 
 26
 We have held that "[t]he deference given the jury's interpretation of the facts is even greater in FELA cases." Clark v. Kentucky & Indiana Term. R.R., 728 F.2d 307, 310 (6th Cir.1984). The extent of the deference may be seen in the lengths to which courts will go to affirm a jury verdict in a FELA case. See, e.g., Gallick v. Baltimore & Ohio R.R., 372 U.S. 108 (1963); Rogers v. Mo. Pac. R.R., 352 U.S. 500 (1957); and Lavender v. Kurn, 327 U.S. 645 (1946).
 
 
 27
 In this case, the district court found that there was evidence of negligence on the part of the railroad from which the jury could infer that it knew or should have known that Cybula was required to kneel on hard surfaces on and around the locomotives he maintained. The protective knee guards it maintained in its storeroom might have lessened the trauma to Cybula's knees, as Dr. Ike testified, and the fact that the railroad had knee pads available might have been taken by the jury to show a general awareness on the part of the railroad of the risk of knee injuries to its employees. Since the railroad was aware of Cybula's complaints about his knees sometime in 1987, the jury might well have found it guilty of negligence in failing to issue knee pads to Cybula or even inform him of their availability.
 
 
 28
 In deciding Rule 50(b) motions, courts are to uphold the decision of a jury unless they find that reasonable men must have come to the opposite conclusion. Coffy v. Multi-County Narcotics Bureau, 600 F.2d 570, 579 (6th Cir.1979); Morelock v. NCR Corp., 586 F.2d 1096, 1104 (6th Cir.1978), cert. denied, 441 U.S. 906 (1979); Gillham v. Admiral Corp., 523 F.2d 102, 109 (6th Cir.1975), cert. denied, 424 U.S. 913 (1976). In FELA cases there are additional restraints to apply owing to the unusual liability standards applicable, and there are clear warnings against usurping a jury's function.
 
 
 29
 The decisions of this Court after the 1939 amendments teach that the Congress vested the power of decision in these actions exclusively in the jury in all but the infrequent cases where fair-minded jurors cannot honestly differ whether fault of the employer played any part in the employee's injury. Special and important reasons for the grant of certiorari in these cases are certainly present when lower federal and state courts persistently deprive litigants of their right to a jury determination.
 
 
 30
 Rogers, 352 U.S. at 510 (footnote omitted). More specifically, the Court will not sanction the overthrow of a verdict except
 
 
 31
 when there is a complete absence of probative facts to support the conclusion reached.... But where, as here, there is an evidentiary basis for the jury's verdict, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion. And the appellate court's function is exhausted when that evidentiary basis becomes apparent, it being immaterial that the court might draw a contrary inference or feel that another conclusion is more reasonable.
 
 
 32
 Lavender, 327 U.S. at 653. The evidentiary basis for the jury's finding of negligence in this case might well have been the employer's failure to offer or provide available safety equipment in the form of the knee pads it had available when it knew or should have known its employee was suffering. The evidence of causation may be taken from the testimony of Dr. Ike, a board certified specialist in rheumatology, who testified that Cybula's "work ... had contributed to developing [his condition] in the first place [because] it put rather severe demands on his knees...." J.A. 42-43. This is an "evidentiary basis" for the jury's verdict in this case, and, therefore, the district court was correct in refusing to disturb the verdict.
 
 B.
 
 33
 The railroad next argues that "[t]he trial court committed reversible error by allowing the case to go to the jury with instructions that defendant had a duty to provide safety equipment to the plaintiff." In raising this issue, however, the railroad does not point to the court's instructions or attempt to explain how they were legally wrong. Rather, it admits that its "duty to provide ... the necessary and appropriate safety devices for [its] employees is well stated in case law," Brief of Appellant at 17, and then argues that there was no evidence to show negligence on the part of the railroad. It concludes with the following language:
 
 
 34
 It is Defendant's position that the jury should never had [sic] been presented with the issue of Defendant's duty to provide Plaintiff with safety equipment. Even if there is a duty on the Defendant's part to anticipate the reasonableness of their actions, as a matter of law, the Court should have ruled that there was insufficient evidence of negligence on Defendant's part to allow the issue of duty go [sic] to the jury.
 
 
 35
 Brief of Appellant at 19 (emphasis added). Since the railroad does not bother to identify any particular language in the instructions it might wish to challenge, and since it admits that the employer's duty to provide appropriate safety devices is well-settled, we find this issue to be meritless.
 
 C.
 
 36
 Appellant's final argument is that the district court erred in refusing to grant its motion for a new trial as an alternative to J.N.O.V. On review, the decision of a trial court to deny a motion for a new trial will be reversed only on a showing of abuse of discretion. Cathey v. Johns-Manville Sales Corp., 776 F.2d 1565, 1573 (6th Cir.1985), cert. denied, 478 U.S. 1021 (1986); Moran v. Johns-Manville Sales Corp., 691 F.2d 811, 816 (6th Cir.1982).
 
 
 37
 When it rules on a motion for a new trial grounded on the allegation that the evidence is insufficient to support a verdict, the district court should weigh the evidence and grant a new trial only if the verdict is against the clear weight of the evidence. T.C.P. Indus., Inc. v. Uniroyal, Inc., 661 F.2d 542, 546 (6th Cir.1981). When applying the abuse of discretion standard, this court will not set aside the order of a lower court "unless it has a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." Taylor v. United States Parole Comm'n, 734 F.2d 1152, 1155 (6th Cir.1984) (quoting Balani v. Immigration and Naturalization Serv., 669 F.2d 1157, 1160 (6th Cir.1982)).
 
 
 38
 In his opinion and order, the district court, after reciting some of the Supreme Court's warnings against overturning jury verdicts in FELA cases, denied the railroad's motion for a new trial because it was "satisfied that no miscarriage of justice occurred." Although the district court articulated the different standards applicable to motions for new trial and for judgment notwithstanding the verdict, and although the court recognized that it could weigh the evidence in considering the grant of a new trial, there is no discussion in its opinion of the weight of the evidence. However, after hearing argument of counsel and considering the briefs and record in this case, we are satisfied that the district court did not err in denying the railroad's motion for a new trial as the clear weight of the evidence is not against the verdict. Accordingly, the district court did not abuse its discretion in denying the motion for a new trial.
 
 D.
 
 39
 At the end of its brief, almost parenthetically, the railroad argues that the verdict for the plaintiff for $817,700 is excessive. This argument is not covered in the appellant's formal statement of issues, and the record shows that it was not raised in the trial court by motion or otherwise. The trial court, therefore, has had no opportunity to exercise its discretion on the question of damages, and the record is inadequate for review of this issue on appeal. For these reasons, this court has required that questions of the excessiveness or inadequacy of verdicts be submitted in the first instance to the trial court. Young v. Langley, 793 F.2d 792, 794 (6th Cir.), cert. denied, 479 U.S. 950 (1986). Therefore, this issue is not appropriate for our review.
 
 III.
 
 40
 For the reasons stated, the district court's denial of the railroad's motions for directed verdict, for judgment notwithstanding the verdict, or in the alternative for a new trial, is AFFIRMED.
 
 WELLFORD, Senior Circuit Judge, dissenting:
 
 41
 I write separately to emphasize the bases for disagreement about what to me is an unfortunate result in this case. Defendant railroad, for reasons unknown, chose to present no evidence after plaintiff rested, and it did not challenge in the district court the amount of the verdict. The proof as to causation, in my view, however, is doubtful and insufficient to sustain the hefty verdict. The amount of the verdict, if properly challenged in a timely fashion, might well have been found excessive under the circumstances.
 
 CAUSATION
 
 42
 The key testimony was the video-taped deposition of an unchallenged expert in rheumatology, Dr. Ike. He saw plaintiff in May of 1988 and, based on patient history, related that trouble with plaintiff's knees began in February of that year. Plaintiff's testimony was that he remembered advising a railroad supervisor and official in late 1987 that he was experiencing knee pain or difficulty, and obtained foam rubber to use as a cushion. "It just got to the point that I just got down in a position to work on the diesels and I just couldn't get back up without pulling myself up." He "couldn't take it anymore" in February of 1988. The railroad superintendent in plaintiff's maintenance area, William White, testified that he received no complaints, before plaintiff quit working, about a knee problem in February.
 
 
 43
 Dr. Ike identified plaintiff's particular problem in May of 1988 as "getting up from a kneeling position." Dr. Ike diagnosed plaintiff's condition as degenerative arthritis although "x-ray evaluation to date had been normal" (indicating x-ray could not have revealed this problem earlier). Dr. Ike, based on his examination and the results of prior treatment by a Dr. Eaton, found a "systemic disorder" and a "set of abnormalities within his knee," probably congenital in nature. In my view, no expert testimony attributed the disorder or abnormality in the knee to anything the railroad did or did not do with regard to issuing a kneepad to Cybula.
 
 
 44
 The doctor opined that frequent kneeling (not related to a particular surface) brought about repetitive trauma to plaintiff's knees and "could have contributed to the damage ... seen in Mr. Cybula's [knee] joint." (Emphasis added). Dr. Ike was of the opinion that use of the knee pad in question "probably would have lessened ... the trauma to his knee [involved in frequent kneeling].... [H]is knee disorder is a combination of things starting out with abnormal cartilage." (Emphasis added). He added, however, that "[h]ow much [wearing kneepads] would have helped, how much it might have delayed his disability it's--it's very difficult to say." (Emphasis added). Dr. Ike concluded that "no one can say which set of traumas contributes to his knee disorder." (Emphasis added).
 
 
 45
 At most, Dr. Ike was of the view that trauma to the knee at the railroad job, or any job for that matter, inevitably would have brought about plaintiff's knee problem: "my best medical guess is [use of a knee pad] only would have delayed things probably because he had so much[1] working against him." (Emphasis added).
 
 
 46
 On cross examination, Dr. Ike conceded that "anything he did that involved bearing weight on his knees would contribute to that [degenerative arthritis]." (Emphasis added). A major contributor to his problem was his excessive weight along with "stress that occurs with everyday life." Cybula admitted to Dr. Ike that he mowed his lawn the day before his visit. Dr. Ike could not "say that any failure to wear pads was the contributing cause of the arthritis." He could only "suppose certain contributing factors," which have been mentioned brought it about, or hastened the condition.
 
 
 47
 As did plaintiff's expert, I have a very difficult time finding even the level of causation required in a FELA case, such as this, to exist in this case. It is apparent that any kind of work involving frequent kneeling, lots of standing and walking, going up stairs, and heavy lifting would have caused plaintiff to have developed arthritis in the knee given his preexisting condition, unknown to plaintiff and to the defendant railroad. No one else at the railroad had previously experienced this type of knee problem, and plaintiff did not seek out medical attention himself until late 1987.
 
 
 48
 Given the FELA law cited by the majority, I can agree that there was no abuse of discretion in overruling the defendant's motion for j.n.o.v. I would find, however, that the preponderance of the evidence weights against the necessary proof of causation which must be adduced by plaintiff. I conclude this, recognizing that the countervailing evidence here consists only of cross examination of witnesses (produced by plaintiff), the testimony of defendant's agents produced by plaintiff, and the uncertain testimony of Dr. Ike. I entertain a definite conviction that the proof of causation was insufficient after weighing the entire record in this case.
 
 DAMAGES
 
 49
 I must unhappily agree that the majority is correct that defendant gave the district court "no opportunity to exercise its discretion on the question of damages." Plaintiff, it seems clear, would have experienced his knee difficulty at some time regardless of his railroad work. Had defendant raised the issue, it would seem to me that the verdict here was clearly excessive. Plaintiff's expected work life was entirely conjectural. Defendant's failure in this regard, however, precludes consideration of that potential for granting a new trial.
 
 
 
 [1]
 The "so much working against" plaintiff was his congenital abnormal knee condition, his far more than normal weight, and his lifetime of athletic endeavor and heavy work (only a part of which was railroad work)